1  **LAW OFFICES OF MARTIN STANLEY**
Martin Louis Stanley [State Bar No. 102413]
2  Maximilian Lee [State Bar No. 287597]
137 Bay Street, Unit 2
3  Santa Monica, California 90401
Telephone:  (310) 399-2555
4  Facsimile:  (310) 399-1190

5
**LAW OFFICES OF EDMONT T. BARRETT**
6  Edmont T. Barrett [State Bar No. 74117]
5150 East Pacific Coast Highway
7  Long Beach, CA 90804
Telephone: (562) 597-3070
8  Facsimile: (562) 494-1132

9  Attorneys for Plaintiff
MARCO MILLA
10

11

12                  **UNITED STATES DISTRICT COURT**

13                  **CENTRAL DISTRICT OF CALIFORNIA**

14

15  MARCO MILLA an individual,          )  Case No. CV16-134-R (AJWx)
                                        )
16              Plaintiff,              )  Hon. Manuel Real, Judge Presiding
                                        )
17       vs.                            )  **PLAINTIFF MARCO MILLA'S**
18                                      )  **MEMORANDUM OF**
                                        )  **CONTENTIONS OF FACT AND**
19  CITY OF LOS ANGELES a municipal     )  **LA**
20  entity; LOS ANGELES POLICE          )
    DEPARTMENT, a municipal entity;     )
21  COUNTY OF LOS ANGELES,              )  **Trial**
22  DETECTIVE R. ULLEY AND              )  **Date:      February 21, 2017**
    DETECTIVE J. VANDER HORCK, and      )  **Time:        9:00 A.M.**
23  DOES 1 through 100, inclusive,      )  **Courtroom: 8**
24                                      )
25              Defendants.             )  **Pre-Trial Conference**
                                        )  **Date:        January 23, 2017**
26                                      )  **Time:      11:00 A.M.**
27  _____)  **Courtroom: 8**

28

                                   -1-
              **PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1    TO THE HONORABLE COURT, ALL PARTIES, AND THEIR COUNSEL OF

2  RECORD:

3    Pursuant to this Honorable Court's Scheduling Order entered on July 13, 2016,

4  Plaintiff MARCO MILLA hereby submits the following Memorandum of Contentions of

5  Fact and Law.

6

7

8

9

10  DATED:  January 3, 2017                  Respectfully submitted,

11                                            LAW OFFICES OF MARTIN STANLEY

12

13                                            By:_____/s/ Martin Stanley_____
                                              MARTIN STANLEY, ESQ.
14                                            Attorneys for Plaintiff MARCO MILLA

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

## MEMORANDUM OF CONTENTIONS OF FACT AND LAW

## I. INTRODUCTION

The plaintiff in this action is MARCO MILLA.

The defendants in this action are the CITY OF LOS ANGELES, LOS ANGELES POLICE DEPARTMENT, and RICHARD ULLEY, a current Los Angeles Police Department police officer.

Plaintiff MILLA filed this civil action arising from his wrongful conviction and imprisonment for approximately 12 years and 8 months due to the unconstitutional acts and omissions of Defendants.

## II. PLAINTIFF'S CONTENTIONS OF FACTS AND LAW

### A. PLAINTIFF'S CLAIMS [LOCAL RULE 16-4.1(a)]

Defendants' liability is founded under Title 42 U.S.C. § 1983, which provides, in relevant part, that:

"Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State… subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Defendant's misconduct on Plaintiff MARCO MILLA is actionable under Title 42 U.S.C. § 1983. *Monroe v. Pape*, 365 U.S. 167 (1961).

One of the most important purposes of Title 42 U.S.C. § 1983 is to deter future abuses of power by persons acting under color of law. *City of Newport v. Fact Concerts*, 453 U.S. 247 (1981).

Plaintiff MARCO MILLA will pursue the following claims alleged in his Second Amended Complaint against Defendants:

-3-
**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

(1) Violation of Civil Rights Pursuant to Title 42 U.S.C. § 1983 Against Defendant RICHARD ULLEY for Civil Rights Violations for Unlawful Imprisonment and Malicious Prosecution

(2) Violation of Civil Rights Pursuant to Title 42 U.S.C. § 1983 Against Defendant CITY OF LOS ANGELES and LOS ANGELES POLICE DEPARTMENT for Municipal Liability for Civil Rights Violations for Unlawful Imprisonment and Malicious Prosecution

**B.     ELEMENTS OF PLAINTIFF'S CLAIMS [LOCAL RULE 16-4.1(b)]**

(1) Claim 1: Violation of Civil Rights Pursuant to Title 42 U.S.C. § 1983 Against Defendant RICHARD ULLEY for Civil Rights Violations for Unlawful Imprisonment and Malicious Prosecution

In order to prevail on his 42 U.S.C. § 1983 claim against the Defendant RICHARD ULLEY, Plaintiff MILLA must prove each of the following elements by a preponderance of the evidence:

1. the defendant acted under color of state law; and

2. the acts or failure to act of the defendant deprived the plaintiff of his particular rights under the laws of the United States or the United States Constitution as explained below.

*See* Ninth Circuit Manual of Model Civil Jury Instructions § 9.3 (2016).

To prove that Defendant ULLEY violated Plaintiff MILLA's civil rights by withholding evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), Plaintiff MILLA must prove the following:

1. The information must be favorable to the accused;

2. The information must be suppressed—that is, not disclosed—by the government, either willfully or inadvertently; and

3. The information must be "material" to guilt or to punishment.

*See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

-4-

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

To prove that Defendant ULLEY violated Plaintiff MILLA's civil rights by fabricating evidence during their investigation in violation of *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001), Plaintiff MILLA may show that either:

1. Defendants continued their investigation of Plaintiff despite the fact that they knew or should have known that he was innocent; or

2. Defendants used investigative techniques that were coercive and abusive that they knew or should have known that those techniques would yield false information.

"The elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *Easton v. Sutter Coast Hospital*, 80 Cal.App.4th 485, 496 (Cal. Ct. App. 2000).

"In order to prevail on a § 1983 claim of malicious prosecution, a plaintiff must show that the defendants prosecuted him with malice and without probable cause, and that they did so for the purpose of denying him equal protection or another specific constitutional right." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (*citing to Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir.1995))(brackets and quotation marks omitted).

(2) Claim 2: Violation of Civil Rights Pursuant to Title 42 U.S.C. § 1983 Against Defendant CITY OF LOS ANGELES and LOS ANGELES POLICE DEPARTMENT for Municipal Liability for Civil Rights Violations for Unlawful Imprisonment and Malicious Prosecution

In order to prevail on his 42 U.S.C. § 1983 claim against Defendant CITY OF LOS ANGELES alleging liability based on a policy of failure to train its police officers or other employees, the plaintiff must prove each of the following elements by a preponderance of the evidence:

1. The acts or failure to act of Defendant CITY OF LOS ANGELES's police officers deprived the plaintiff of his particular rights under the laws of the

-5-

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

United States or the United States Constitution as explained in later instructions;

2. Defendant CITY OF LOS ANGELES's police officers acted under color of state law;

3. The training policies of the Defendant CITY OF LOS ANGELES were not adequate to train its police officers to handle the usual and recurring situations with which they must deal;

4. Defendant CITY OF LOS ANGELES was deliberately indifferent to the obvious consequences of its failure to train its police officers or employees adequately; and

5. The failure of the Defendant CITY OF LOS ANGELES to provide adequate training caused the deprivation of the plaintiff's rights by the Defendant CITY OF LOS ANGELES's police officers or employees; that is, the defendant's failure to train is so closely related to the deprivation of the plaintiff's rights as to be the moving force that caused the ultimate injury.

"Deliberate indifference" is the conscious choice to disregard the consequences of one's acts or omissions. The plaintiff may prove deliberate indifference in this case by showing that the Defendant CITY OF LOS ANGELES knew its failure to train adequately made it highly predictable that its police officers would engage in conduct that would deprive persons such as the plaintiff of his rights.

*See* Ninth Circuit Manual of Model Civil Jury Instructions § 9.8 (2016).

## C.    KEY EVIDENCE IN SUPPORT OF PLAINTIFF'S CLAIMS [LOCAL RULE 16-4.1(c)]

The key testimony supporting Plaintiff's claims is the testimony of the officers and percipient witnesses as set forth on Plaintiff's witness list.  Such testimony will establish that Plaintiff MILLA was falsely arrested and/or maliciously prosecuted, resulting in his

-6-
**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

being damaged by serving approximately 12 years and 8 months in prison and having life long emotional distress.

Plaintiff's claims are supported by documentary evidence produced in the course of discovery in this case, including the documents produced in discovery, such as Defendants' Murder Book, the District Attorney File for the prosecution of Plaintiff MARCO MILLA, and the policies and procedures of the Los Angeles Police Department, as well as the deposition testimony of all witnesses, including Defendant RICHARD ULLEY, John Vander Horck, Mark Maldonado, and Plaintiff MARCO MILLA, and the anticipated deposition and trial testimony of other witnesses, such as the district attorneys involved in the criminal prosecution of Plaintiff MARCO MILLA's as well as Plaintiff MARCO MILLA's criminal trial defense attorney.

Other facts to be adduced at trial will include the testimony of Plaintiff's police practices expert witness Steve Strong, who will set forth the following opinions from his initial report:

"1. The Detectives acted unreasonably by failing to investigate information available to them that Julio "Downer" Munoz was the shooter in this case.

2. The Detectives acted unreasonably by failing to show pictures of Julio "Downer" Munoz, the actual shooter in this instance and a suspect identified by LAPD Gang expert Officer Mark Maldonado, to any of the witnesses.

3. The Detectives acted unreasonably by failing to tell the district attorney that Ramar Jenkins only stated Marco Milla looked most like the shooter out of all of the photos displayed, and did not make a positive identification when first shown photo line-up "E".

4. The Detectives acted unreasonably by not informing the filing district attorney that Marco Milla and at least one other witness provided the detectives with an alibi which, if true, excluded Marco Milla as a suspect.

5. The Detectives acted unreasonably by not following up with an investigation to determine whether Marco Milla's alibi was true or not.

-7-

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

6. The Detectives acted unreasonably by failing to investigate Marco Milla's alibi, which was not due to lack of cooperation, but in reality was due to the Detectives' failure to use reasonable efforts to investigate the alibi.

7. The Detectives acted unreasonably by failing to inform the district attorneys that Ramar Jenkins did not identify Marco Milla the first time he viewed a photo display that included Marco Milla's photograph.

8. The Detectives acted unreasonably when they failed to inform the filing district attorney that, before the "positive identification" of Marco Milla in photo line-up card "E" by witness Ramar Jenkins, they had shown Jenkins photo line-up card "B" which included a photograph of Marco Milla, and Jenkins did not identify Marco Milla.

9. The Detectives acted unreasonably by showing witness Ramar Jenkins two photo line-up cards, both including the photograph of Marco Milla, because that tainted the identification made the second time he saw the photograph.

10. The Detectives acted unreasonably if they failed to properly canvas the neighborhood where the subject shooting took place, which would have turned up exculpatory witness Maria Flores.

11. The Detectives acted unreasonably by attempting to intimidate Plaintiffs police practices expert concerning an accurate photograph of the real shooter in this case, Julio "Downer" Munoz, that the expert obtained from the LAPD.

12. A detective acting reasonably would have completed the investigation of the alibi provided by Marco Milla, and corroborated by Alex Velarde.

13. The Detectives acted unreasonably by failing to completely investigate Marco Milla's alibi that he was not present at the scene of the shooting and was in Sandra Jauregui's apartment in Downey with multiple other witnesses. For example, the Detectives failed to interview Sandra Jauregui

-8-

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

and Irma Navarro, witnesses with knowledge of Marco Milla's whereabouts on the day of the subject shooting and who were identified by Marco Milla and Alex Velarde. The Detectives' failure to interview Sandra Jauregui was unreasonable given that she was voluntarily present at the police station on October 25,2001, and should have been interviewed at that time.

14. A detective acting reasonably would have checked with neighbors of the apartment that Marco Milla said he was present on the day of the subject shooting, as well as had been there on an ongoing basis. The Detectives acted unreasonably by failing to speak with all such neighbors.

15. A detective acting reasonably would have investigated all individuals identified by Officer Maldonado as possible suspects, including Julio "Downer" Munoz, who has been identified as the actual person who committed the subject shooting. In particular, a detective acting reasonably would have reviewed any field interviews with these suspects identified by Officer Maldonado as possible suspects and their associates. The Detectives acted unreasonably by failing to investigate all individuals identified by Officer Maldonado.

16. A detective acting reasonably would have investigated whether Julio "Downer" Munoz was a suspect to the shooting after a new witness testified under oath at a court hearing in 2003 that Julio "Downer" Munoz committed the subject shooting.  The Detectives acted unreasonably by failing to investigate Julio "Downer" Munoz for the subject shooting after Maria Flores testified that she knew that Julio "Downer" Munoz committed the shooting because she saw him do it, and because he admitted it to her.

17. A reasonable detective would have included all of the suspected gang members as provided by Officer Maldanado in a photo line-up to present to victims and witnesses. The Detectives acted unreasonably by failing to do so.

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

18. A reasonable detective would not include the same person in more than one photo line-up, which the Detectives unreasonably did in this case.

19. Once the Detectives knew of another eye witness to the crime (Maria Flores), they should have investigated her story and showed photos of Julio "Downer" Munoz to all of the witnesses to see if the other witnesses could make an ID. The Detectives acted unreasonably by failing to do so.

20. The common practice of detective work is to write complete reports including all the facts, good or bad, with no opinions, and present the facts to the District Attorney for filing. That was not done in this case. Instead, the Detectives acted unreasonably by leaving out pertinent information regarding a valid alibi that they did not fully and completely investigate.

21. In this case, Marco Milla was arrested without incident at his home at 7:00 a.m., and the detectives also searched the residence pursuant to a search warrant. Nothing was found connecting him to the murder in this case. At that time, a friend named Celendonio Alejandro Velarde, also known as Alex Velarde, was present. Alex Velarde voluntarily went to the police station with them to give a statement. Alex Velarde and Marco Milla were kept separated at all relevant times. When at the station, the police interviewed Alex Velarde first. According to the Detectives' Chronological Log, "Velarde denied all knowledge of the murder and being at or near the scene when it occurred. He said he and Milla were at 'Sandra's' [apartment] when it occurred." Next, the detectives interviewed Marco Milla. According to the same Chronological Log, "Milla denied all knowledge of the murder and being at or near the scene when it occurred. He said he was at his girlfriend 'Sandra's apartment in Downey during the time of the murder. '" It was unreasonable for the Detectives to fail to fully investigate this alibi and to keep this information from the district attorney.

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

22. The next morning, at 10:30 am, Sandra came to the police station. The detectives' Chronological Log states that, "Milla's girlfriend 'Sandra' (Sandra Jauregui, 9023 Hasty Av, Downey, cell ph# (562) 879-2246, CDL# B8789290) came to Harbor Station to visit Milla. Det. VanderHorck spoke to Jauregui & exchanged information & told her Dets wanted to interview her A.S.A.P. after that date." It was unreasonable for the detectives to fail to interview this alibi witness, as well as keep this failure from the district attorney.

23. Then, at 2:00 p.m. on the same day, the Detectives acted unreasonably by presenting the case to the District Attorney' Filing Deputy, Scott Carbaugh. The custom and practice of the LAPD at that time was that Detectives present a murder case to the District Attorney's office by bringing along the murder book and giving the filing deputy a copy of the final follow-up report, which details the facts of the crime and the findings of their investigation. The murder book is not copied and given to the filing deputy until after a criminal case was filed.

24. The Detectives acted unreasonably by providing the district attorneys with a final follow-up report which completely leaves out the fact that both Marco Milla and Alex Velarde said they were together at Sandra's apartment at the time of the subject murder, stating only that both MilIa and Velarde denied any knowledge of the murder, and denied that they were in the area. It also leaves out the fact that the Detectives spoke with Sandra earlier that day, but did not formally interview her. Consequently, the filing deputy made his decision to file charges against Milla without knowing that Milla had a valid alibi which was not adequately investigated.

25. The Detectives acted unreasonably by failing to advise the filing district attorney about Marco Milla's alibi evidence that Marco Milla and Alex Velarde told them.  The detectives specifically omitted that Milla and

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Velarde claimed to be in Downey at the apartment of Sandra Jauregui and Irma Navarro. Irma Navarro also had crucial evidence of this alibi and the Detectives did not conduct any type of interview with Sandra Jauregui or Irma Navarro, even though Sandra Jauregui was present at the police station the morning of the day in which the Detectives presented their incomplete paperwork to the filing district attorney. In fact, the Detectives never made the filing district attorney aware of the fact that the Detectives failed to conduct any reasonable investigation into the alibi evidence which would have cleared Marco Milla back in 2001.

26. The Detectives, acting on behalf of the LAPD, acted unreasonably by failing to provide the District Attorney with full and complete information at the time of meetings or otherwise, as demonstrated above, thereby precluding the district attorneys from being able to utilize their independent judgment.

27. The Detectives, acting on behalf of the LAPD, acted unreasonably by failing to provide the Defense Attorney with complete disclosure of any and all relevant information as demonstrated above.

28. The Los Angeles Police Department acted unreasonably if it failed to train the officers appropriately regarding investigative practices as demonstrated above.

29. The Los Angeles Police Department acted unreasonably if it failed to establish clear policies and practices that would have prevented and/or resulted in the avoidance of the actions and omissions that led to the wrongful incarceration of Marco Milla, as demonstrated above.

30. The Los Angeles Police Department acted unreasonably if it failed to take corrective action against the detectives subsequent to the discovery of the inappropriate actions and omissions the [sic] led to the wrongful

incarceration of Marco Milla demonstrated above in order to prevent future recurrence."

Other facts to be adduced at trial will also include the testimony of Plaintiff's eyewitness identification expert witness Robert Shomer, Ph.D., who will set forth the following opinions from his initial report:

"Eyewitness identification has to be based on what the witness actually saw. As laid out below, the eyewitness identification procedures used in this case were much more in line with the extraction of an identification of the police suspect rather than obtaining identifications based on who the eyewitnesses had seen.

Based on a very large body of specific research on the reliability of eyewitness identification, over 2000 specific experiments, done over the last fifty years in at least six countries, the accuracy of stranger eyewitness identification has been found to be quite low. Under the best of conditions, accuracy of identification has been described as about like flipping a coin.

Factors such as sudden unexpected stress, and weapon's focus and multiple perpetrators have been found to significantly decrease this already low level of accuracy. The single largest cause of erroneous identification is that many different people resemble each other and the conditions of most crimes reduce the ability to accurately identify distinguish one similar looking person from another.

Erroneous eyewitness identifications, and inadequate or suggestive identification procedures in real crimes such as rape and sexual assault, even with long exposure times, have been found to be the overwhelmingly, major source of erroneous conviction.

People do not function like video cameras. Seeing someone in a stressful situation even in good lighting, for an adequate amount of time, at an adequate

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

distance has not been found to be equivalent to later being able to accurately identify them. Lighting and distance can be later established but in stressful situations the passage of time are estimates that are almost invariably exaggerated. This is primarily because in stress the "body clock" is significantly sped up, leading to witnesses estimating that a situation took longer than it actually did.

In addition, if there are many individuals present during the crime, this creates a divided focus of attention which reduces the focus of attention necessary to make accurate observations necessary to later make accurate eyewitness identifications.

Another common fallacy in the area of eyewitness identification is that stress "stamps in." In this fallacious notion witness's observations of people while under stress would make them more accurate in later identifying who was involved.

There is very consistent research on the effects of stress on the accuracy of eyewitness identification shows that, in fact, stress "stamps out."  Stress significantly interferes with the very neurochemical processes necessary to create accurate perceptions, as well as interfering with those brain processes necessary to create the accurate memories of those perceptions that are of course necessary to later make accurate eyewitness identifications.

Eyewitness identification is unique evidence. It has no independent existence and only exists only in the mind of the eyewitness. Due to the unique nature of this evidence the particular type of identification procedure that is used is critical as to whether the identification is valid and reliable. If the procedure is suggestive and suggests "the answer," the witness may believe that they are essentially confirming the choice of the police or someone else, instead of using their own memories of their perceptions.

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Because of the unique nature of this evidence, if the procedure was not done correctly it can not be erased from the memory of the witness and done over again in a less suggestive way. Even if the procedure had been done correctly it leaves traces in the memory whether or not an identification was made, and influences all future identifications in court or other settings. Often, while the accuracy of memory of the witness is inevitably diminishing, they become more confident of their identification, even if had originally been arrived at in a suggestive procedure. They are more committed to their choice rather than becoming more accurate.

Eyewitness identification is the demonstrated ability to select the same person previously seen, but in the context of a fair, reliable and valid identification procedure. A multi-alternative procedure should be done as soon as possible after the crime because research has confirmed that there is a very large fall off in accuracy for eyewitness identification after the first twenty four hours, and a continued decline in accuracy as more time passes. Being asked to focus on faces for the purpose of identifying someone is a fairly rare experience. If relatively soon after a crime a witness goes through an identification procedure, whether or not they make a choice, the memory of that procedure and the faces the witness was exposed to does not disappear.

Eyewitness evidence is unlike trace or physical evidence. It is essential to understand that this evidence exists only in the mind of the eyewitness.  Unlike evidence such as a blood sample, or a fingerprint, eyewitness evidence has no independent existence. Physical evidence can be tested and re-tested, this is not true for eyewitness identification. There is no "mental eraser" that can be used to remove the effects of the first test and do a valid re-test. It is not really an exaggeration to characterize an eyewitness identification procedure as an attempt to determine or to "read" what is in the mind or memory of the witness. Like physical evidence if the evidence is contaminated it is not

-15-
**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

reliable.  To be reliable an eyewitness identification has to be the demonstrated ability of the eyewitness to identify the very same person they had seen, but only if that ability is demonstrated in the context of a valid and reliable "test." If in any way the procedure had suggested the "answer," then it is not fair, valid, or reliable representation of the ability of the eyewitness to identify based only on their observations and memory. While it is obvious that these considerations apply to explicit suggestions, such as the individual conducting the procedure pointing to a photo in the set and asking, "Is this the person you saw?" it is not obvious that it is even more important to consider implicit or inherent suggestions, suggestions that may be built into an identification procedure. The later are even more dangerous to the cause of accuracy because while an explicit suggestion may be resisted, implicit suggestions conveyed by the way an identification procedure was carried out are insidious because the witness is usually unaware of the influence. There is massive scientific evidence that demonstrable influence can occur, without individuals being aware of what had influenced them. It is also to important to note that the same research shows that influence can take place without the "influencer" being aware that they are doing so.

Memories of the individuals in photos shown to the eyewitness, are not kept in separate "water-tight" compartments, but rather are mixed together, or "incorporated" into whatever memory of the suspect remains in their memory. Based on the way human memory has been found to operate, each time an eyewitness is exposed to an identification procedure, the procedure itself, and the way it is conducted, has been found to profoundly and permanently influence the memory.

The importance of this fact is that changes in the memory of the eyewitness are actually changes in the evidence.

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

The special nature of eyewitness identification evidence therefore places a special responsibility on the law enforcement individuals entrusted with trying to obtain accurate eyewitness identifications.

An eyewitness identification cannot be just a guess or a speculation by the eyewitness. Nor should it be a choice of the eyewitness that was influenced by the way in which the identification procedure had been carried out.

*Photo arrays are made up of a set of small two-dimensional depictions of the heads and a portion of the shoulders of (usually) six individuals. Due to the limited amount of information in flat photos, this is a difficult task in which to try to make an accurate identification. The photo array or so-called "six pack," is composed of the suspect of interest to law enforcement and five filler photos.

For the procedure to be valid and reliable a key principle is that each filler should each match the initial description given by the eyewitnesses to the same extent as the suspect. If for any reason, the suspect matches the description more closely than any of the fillers, there may be six photos but there is no "real" set of six choices. There may in fact be only one or two choices upon which the witness will  focus, because they more closely fit the description of the person they had seen.

This similarity among photos and individuals depicted should extend not just to such things as the height, weight, age, and ethnicity, but also to accouterments such as facial jewelry, the backgrounds of the photos, and to the comparative size of the heads of the individuals in each photo. If one and only one photo contains a person with facial jewelry, as occurred in this case, whether or whether not that feature was not part of the initial description that makes that photo stand out like a "sore thumb" and the entire procedure is suggestive because the "sore thumb" alternative will be paid more attention to than any of the others. If a photo sticks out like the proverbial "Sore Thumb"

-17-
**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

as one would if it were the only one with facial jewelry, eyewitnesses have been found to eliminate the other photos and focus on the sore thumb alternative. An eyewitness identification procedure such as this was in effect designed to extract from the witnesses the identification of the person the police suspected was responsible. This is in clear contrast to the use of a valid and reliable eyewitness procedure to try to obtain an eyewitness identification based only on the observations and memory of the eyewitnesses and not one the way the test was constructed or administered.

The written admonition used in the identification procedures in this case were not balanced since they did not say, in addition to the fact that the suspect may or may not be in the group of photos being shown, that it was just as important to clear the innocent as to make an identification of a suspect. The lack of this balance has been found to encourage witnesses to assume that the person law enforcement is interested in, is in one of the photos and it is their task to determine which one it is in that group. This lack of a balanced admonition has been found to encourage witnesses to assume that the person responsible for the crime, the one that law enforcement is interested in, is in fact, in one of the photos, and it is their task to determine which one in the group that is. Witnesses then to use a process of eliminating the photos that don't fit their memory of the initial description and then focus on the one photo that is left. Although this may sound like a reasonable strategy it actually has been found to lead to a higher risk of an erroneous identification. If the admonition had been balanced and clearly stated that it is just as important to clear individuals as to make an identification, witnesses are less likely to confine themselves to a "this must be the one ", or  "lesser of the evils" or "the only one standing" type of judgment.

The lack of a balanced admonition also minimizes a "None of the Above" alternative which should be a legitimate choice. Without it, eyewitnesses

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

more confine themselves to the set of alternatives in front of them, and tend to use the process of elimination.

One of the most important procedural safeguards is that called "Double Blind." Considerable research has shown that whether the police officer who administers the identification procedure is aware of who the suspect is and his position in the array can have an effect on the accuracy of the identification. Because of this many law enforcement entities including many in California have mandated a procedure in which the officer who administers the procedure does not know (Is "Blind" to) which photo contains the suspect. This type of procedure has been found to be significantly less likely to produce an erroneous identification.

Because of the high probability of suggestiveness, any verbal or behavioral interaction, during the eyewitness identification procedure, between the eyewitness and law enforcement personnel who knows in which photo is his suspect, is a major problem for creating a valid and reliable test of identification. This issue has been of such concern as connected to erroneous identifications, that it the basis of the use of a "Double-Blind" procedure in which the administrator of the identification procedure is not aware of (that is, is "blind" to) which photo contains the police suspect. There is a large amount of research supporting the conclusion that the expectations of the police officer can easily be communicated to the witness in a variety of non-explicit ways, without the officer or the witness be aware that this is happening. The "Double Blind" precaution is used throughout medicine because of the well-known ease by which individuals can be influenced to react to placebos by the knowledge of the individuals administering them.

In addition, whether the officer administrating the procedure presents the photos all at the same time, or one at a time, has also been found to have a significant effect on identification accuracy. Simultaneous presentation of the

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

photos (all at the same time) has been found to encourage the use of a process of elimination. This is a relative judgment type of choice instead of a discrete choice – "that is the person. A relative choice such as "This is the closest out of all of them" as one of the witnesses responded, has been found to indicate an erroneous identification. Identification choices that occur very slowly only after a considerable length of time have been found to be indicative of this process of elimination and a final judgment by the witness not of a positive identification, but  rather a selection of the least worst alternative in the set presented to them. This is not an indication of the ability to identify someone but rather the product of a "guessing game."

The largest source of error in eyewitness identification is that many individuals resemble each other. For a witness to specify that out of a set of photos, one resembles the person they saw more than the one in the other photos indicates that they assume that person is in the set the police are showing them, and they do not understand that the could have said "none of the above" which is a valid choice. If an unbalanced admonition had been used along with a presenting the photos all at the same time, that is, simultaneously, the potential inaccurate identification problem is further heightened.

Once again an eyewitness identification is a demonstrated ability of a witness to pick out the very same person they have seen. It is not a guess, or an assumption, or an attempt to guess which alternative is the person suspected by the police.

If physical evidence if it is contaminated it is not reliable. In the same way, if eyewitness evidence is contaminated, the identification is not reliable.  One way the contamination of eyewitness evidence can occur is if the identification procedure had suggested that a particular individual had been involved. If the process is suggestive than afterwards it is not possible to know if the witness could have made the identification without the suggestion. In addition, this can

-20-
**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

not be repaired due to the nature of human memory and the lack of "mental erasers" by doing the procedure again in a non-suggestive way.

 In a fair and non suggestive procedure, the officer making comments during the procedure such as  "I see you have been spending a lot of time looking at photo #X" as one done with one of the eyewitnesses, is completely unacceptable because it can influence on the choice of the witness, and has nothing to do with what the witness saw.

Identification by a witness of a person that has been repeated from one identification procedure to another is contaminated. The second time that person will look more familiar and if chosen by the witness there is no way to rule out the possibility of that the choice is based on the effects of the extra familiarity that is due to repetition. In addition, as was noted here by a witness in this case, their memory of the appearance of person they had seen at the crime had been influenced by the photos they were shown by the police.

In summary, Mr. Milla did not fit the physical description of the shooter, there was no other evidence other than the eyewitness identifications, and the identification procedures used in his case to obtain them were inadequate and suggestive. Instead of valid attempts to obtain valid identification evidence, they were carried out in such a way as to extract an identifications of the police suspect, Mr. Milla."

Other facts to be adduced at trial will also include the testimony of Plaintiff's psychological expert witness regarding Plaintiff's mental and emotional damages.

The Parties have yet to complete depositions in this case and have agreed to take the depositions of other witnesses, such as the district attorneys involved in the criminal prosecution of Plaintiff MARCO MILLA's as well as Plaintiff MARCO MILLA's criminal trial defense attorney, in early January 2017.  Thus, additional facts relating to Plaintiff's claim will likely be adduced at those depositions.

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Further, any possible presumption of independent judgment will be considered rebutted in circumstances including, but not limited to, the following situations: "the prosecutor was pressured by police or was given false information; the police acted maliciously or with reckless disregard for the rights of an arrested person; the prosecutor relied on the police investigation and arrest when he filed the complaint instead of making an independent judgment on the existence of probable cause for the arrest; or the officers otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Beck v. City of Upland*, 527 F.3d 853, 862-63 (brackets, quotation marks, and citations omitted).

As a result of the false arrest and/or malicious prosecution in violation of his civil rights, Plaintiff MILLA suffered life long emotional distress and additional general damages.

## C.   DEFENDANTS' AFFIRMATIVE DEFENSES [LOCAL RULE 16-4.1(d)]

In its Answer to the Second Amended Complaint, Defendant CITY OF LOS ANGELES asserted the following affirmative defenses:

1.      The Complaint and each cause of action therein fails to state a cause of action or a valid theory of recovery against these answering Defendants.

2.      The action is barred by the doctrine of res judicata and/or collateral estoppel.

3.      As to the federal claims and theories of recovery, the answering defendant is protected from liability under the doctrine of qualified immunity, because defendant's conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

4.      The answering defendant is immune from liability for all damages sustained after the prosecutor initiated criminal charges, pursuant to *Smiddy*

-22-
**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1    *v. Varney*, 803 F.2d 1469 (9th Cir. 1986), and *Jackson v. City of San Diego*,

2    121 Cal.App.3d 579 (1981).

3    5.    As to the federal claims and theories of recovery, the answering

4    defendant is protected from liability under the doctrine of witness immunity.

5    6.    Defendant City of Los Angeles and all defendants sued in their

6    official capacities are immune from the imposition of punitive damages.

7

8        In his Answer to the Second Amended Complaint, Defendant RICHARD ULLEY

9    asserted the following affirmative defenses:

10    1.    The Complaint and each cause of action therein fails to state a cause

11    of action or a valid theory of recovery against these answering Defendants.

12    2.    The action is barred by the doctrine of res judicata and/or collateral

13    estoppel.

14    3.    As to the federal claims and theories of recovery, the answering

15    defendant is protected from liability under the doctrine of qualified

16    immunity, because defendant Ulley's conduct did not violate clearly

17    established statutory or constitutional rights of which a reasonable person

18    would have known.

19    4.    The answering defendant is immune from liability for all damages

20    sustained after the prosecutor initiated criminal charges, pursuant to *Smiddy*

21    *v. Varney*, 803 F.2d 1469 (9th Cir. 1986), and *Jackson v. City of San Diego*,

22    121 Cal.App.3d 579 (1981).

23    5.    As to the federal claims and theories of recovery, the answering

24    defendant is protected from liability under the doctrine of witness immunity.

25    6.    Defendant City of Los Angeles and all defendants sued in their

26    official capacities are immune from the imposition of punitive damages.

27

28

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

**D.     ELEMENTS OF DEFENDANTS' AFFIRMATIVE DEFENSES [LOCAL RULE 16-4.1(e)]**

Please see Defendants' Memorandum of Contentions of Law and Fact for the elements of Defendants' affirmative defenses.

**E.     ANTICIPATED EVIDENTIARY ISSUES [LOCAL RULE 16-4(h)]**

Plaintiff contemplates filing various Motions *in Limine* as well as oppositions to Defendants' Motions *in Limine* depending on whether Defendants attempt to introduce matters that are irrelevant or otherwise inadmissible.

**F.     KEY LEGAL ISSUES [LOCAL RULE 16-4(i)]**

The claims and issues in this case are as described above.  Plaintiff does not anticipate or foresee additional issues.

**III. JURY TRIAL**

Timely demand for jury trial has been made by Plaintiff, (as well as the Defendants).

**IV. ATTORNEY'S FEES**

In this case, an award of attorney's fees is authorized by the Civil Rights Attorney's Fees Award Act of 1976 codified in Title 42 U.S.C. § 1988, which states in relevant part:

> "(b) Attorney's fees
>
> In any action of proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318, the Religious Freedom Restoration Act of 1993, the Religious Land Use and Institutionalized Persons Act of 2000, title VI of the Civil Rights Act of 1964, or section 13981 of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs. . . ."

A request for an award of attorney's fees to Plaintiff MARCO MILLA is appropriate to the extent that he is the prevailing party on any of his claims based on Title 42 U.S.C. §

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1   1983.  "Congress intended to permit the interim award of counsel fees only when a party
2   has prevailed on some of his claims." *Hanrahan v. Hampton*, 446 U.S. 754, 758 (1980)
3   (per curiam).  "Plaintiffs may be considered 'prevailing parties' for attorney's fees
4   purposes if they succeed on any significant issue in litigation which achieves some
5   benefit the parties sought in bringing suit."  *Hensley v. Eckerhart*, 461 U.S. 424, 433
6   (1983); *see also La Raza Unida of Southern Alameda County v. Volpe*, 440 F. Supp. 904
7   (N.D. Cal. 1977).  The above authorities support a request for and award of attorney's
8   fees to Plaintiff MILLA as a prevailing party on a Title 42 U.S.C. § 1983 claim.

10  DATED:  January 3, 2017                Respectfully submitted,
11                                         LAW OFFICES OF MARTIN STANLEY

13                                         By:_____/s/ Martin Stanley_____
14                                         MARTIN STANLEY, ESQ.
15                                         Attorneys for Plaintiff MARCO MILLA

-25-
**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**