**MICHAEL N. FEUER**, City Attorney - SBN 111529
**KATHLEEN A. KENEALY**, Chief Assistant City Attorney – SBN 212289
**SCOTT MARCUS**, Chief, Civil Litigation Branch - SBN 184980
**CORY M. BRENTE**, Senior Assistant City Attorney – SBN 115453
**MATTHEW W. McALEER**, Deputy City Attorney – SBN 278595
200 N Main Street, City Hall East, 6th Floor
Los Angeles, CA 90012
Telephone: (213) 978-7043 Facsimile: (213) 978-8785
E-mail: matthew.mcaleer@lacity.org

*Attorneys for Defendants* **CITY OF LOS ANGELES, RICHARD H. ULLEY and DETECTIVE J. VANDER HORCK**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCO MILLA, an individual, | CASE NO. CV16-00134 SVW(AJWx) |
| Plaintiff, | Honorable Judge: Stephen V. Wilson |
| | Honorable Mag. Judge Andrew J. Wistrich |
| vs. | |
| CITY OF LOS ANGELES, a municipal entity; LOS ANGELES POLICE DEPARTMENT, a municipal entity; COUNTY OF LOS ANGELES, DETECTIVE R. ULLEY AND DETECTIVE J. VANDER HORCK, and DOES 1 through 100, inclusive, | **DEFENDANTS' REVISED MEMORANDUM OF CONTENTIONS OF FACT AND LAW** |
| Defendants. | DATE:          October 7, 2019 |
| | TIME:          3:00 P.M. |
| | CTRM:          10A |

**TO THE ABOVE-ENTITLED COURT, PLAINTIFF AND HIS ATTORNEYS OF RECORD HEREIN:**

Pursuant to U.S.D.C. Local Rules 16-4 and 16-4.1, Defendants hereby submit the following revision to the previously-filed Memorandum of Contentions of Fact and Law (Dkt. 52).

/ / /

/ / /

## MEMORANDUM OF POINTS AND AUTHORITIES

## CLAIMS AND DEFENSES

### A.    Plaintiff's Claims

Defendants believe the following are Plaintiffs' claims to be tried in this matter:

***Claim 1:*** 42 U.S.C. § 1983 claim against the Defendant officers under the 4th Amendment for False Imprisonment.

***Claim 2:*** 42 U.S.C. § 1983 claim against the Defendant officers under the 4th Amendment for Malicious Prosecution.

***Claim 3:*** 42 U.S.C. § 1983 *Monell* claim against the Defendant City of Los Angeles.

### B.    Elements for Each Claim

*Claim 1* (42 U.S.C. § 1983 claim against Defendant officers under the 4th Amendment for False Imprisonment):

1.    Defendant officers seized plaintiff's person;

2.    In seizing the plaintiff's person, the Defendant officers acted intentionally; and

3.    The seizure was unreasonable.

In general, a seizure of a person by arrest is reasonable if the arresting officer[s] had probable cause to believe the plaintiff had committed or was committing a crime. In order to prove the seizure in this case was unreasonable, the plaintiff must prove by a preponderance of the evidence that he was arrested without probable cause. "Probable cause" exists when, under all the circumstances known to the officer[s] at the time, an objectively reasonable police officer would conclude there is a fair probability that the plaintiff had committed a crime.

*See* Ninth Circuit Manual of Model Jury Instructions 9.20 and 9.23 (2017).

/ / /

/ / /

/ / /

2

*Claim 2* (42 U.S.C. § 1983 claim against Defendant officers under the 4th Amendment for Malicious Prosecution):

In order to prevail on his malicious prosecution claim under § 1983, the plaintiff must prove that:

1.    The defendant Officers, or either of them, caused Plaintiff to be prosecuted;

2.    They did so with malice and without probable cause;

3.    They did so for the purpose of violating the plaintiff's constitutional rights; and

4.    The criminal proceeding terminated in the plaintiff's favor.

"Probable cause" exists when, under all of the circumstances known to the officers at the time, an objectively reasonable police officer would conclude there is a fair probability that the plaintiff has committed or was committing a crime. If the plaintiff was held to answer following a preliminary hearing in the underlying criminal action, you are to presume that there was probable cause to arrest the plaintiff, unless plaintiff proves by a preponderance of the evidence that the prosecution of the plaintiff was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct taken in bad faith.

"Malice" means to act with ill will, or spite, or for the purpose of causing constitutional injury to another.

*See Tatum v. Moody*, 768 F.3d 806, 814 (9th Cir. 2014).

*Claim 3* (42 U.S.C. § 1983 *Monell* claim against Defendant City of Los Angeles):

1.    Defendant officers acted under color of state law;

2.    The acts of Defendant officers deprived the plaintiff of his particular rights under the laws of the United States Constitution;

/ / /

/ / /

3

3.      Defendant officers acted pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the Defendant City of Los Angeles;

4.      The Defendant City of Los Angeles' official policy or widespread or longstanding practice or custom caused the deprivation of the plaintiff's rights by the Defendant officers; that is, the Defendant City of Los Angeles' official policy or widespread or longstanding practice or custom is so closely related to the deprivation of plaintiff's rights as to be the moving force that caused the ultimate injury.

A person acts "under color of state law" when the person acts or purports to act in the performance of official duties under any state, county, or municipal law, ordinance or regulation.

"Official policy" means a formal policy, such as a rule or regulation adopted by the Defendant City of Los Angeles resulting from a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

"Practice or custom" means any longstanding, widespread, or well-settled practice or custom that constitutes a standard operating procedure of the Defendant City of Los Angeles.

*See* Ninth Circuit Manual of Model Jury Instructions 9.5 (2017).

**C.    Defendants' Evidence in Opposition to Each Claim**

**1.      THE MURDER AND ATTEMPTED MURDERS**

On Saturday, September 29, 2001, at approximately 10 p.m. in the 1500 block of West 204th Street in Los Angeles, Steven Flowers, Robert Hightower, Jr., Ramar Jenkins, and Damadre White were driving down the street looking for R. Hightower's sister, Erica Hightower's, apartment located at 1530 West 204th Street. Flowers, R. Hightower, Jenkins, and White were African American. Since they had never been to E. Hightower's apartment, they got lost, drove past the location and called E. Hightower. She directed them to her apartment and waited outside for them. As they

drove looking for the apartment, they saw a group of male Hispanics gathered in the front yard of the house at 1513 W. 204th Street (which is almost directly north of 1530 W. 204th Street across the street). They also saw gang graffiti relating to the 204 Street gang in the area. Upon seeing E. Hightower and her roommate Senya Williams, the young men got out of the car and started to walk toward E. Hightower's building. They saw a male Hispanic (later identified as Plaintiff) break away from the group of male Hispanics on the north side of the street, walk toward the victims, pull a handgun from his clothing and fire shots at them. As the group ran toward the apartment, R. Hightower was shot in the back, Flowers was shot in the left arm, and Jenkins was shot in the front left side of the abdomen. R. Hightower died from his injuries on October 3, 2001. White, E. Hightower, and Williams, were not hit. When the shooting occurred, E. Hightower's friends, Traci McCombs, Athena Fortune, and Nicole Mayfield were driving west on 204th Street and saw the shooter as he stood in the street, firing his gun, McCombs heard the shooter state, "I got a nigger because of the calls of the fight" (a reference to the Trinidad-Hopkins fight on television that night).

## 2. THE INVESTIGATION INTO THE SHOOTING

### a. Plaintiff was Not Initially a Suspect in the Shootings.

LAPD assigned Harbor Area Homicide Detectives Ulley and Vander Horck to investigate the case on the night of the shooting. Prior to their assignment LAPD Detective Lott preliminarily interviewed Flowers, White, Fortune and McCombs. The witnesses gave varying descriptions of the shooter as a male Hispanic with a skinny build, with either very short hair or a bald head, wearing a dark or gray hoodie shirt. When the Detectives began their investigation they started a Murder Book and a Chronological Record to maintain the documents, evidence, and other information they received in connection with the investigation.

On the night of the incident other LAPD officers canvassed the neighborhood for potential witnesses and information. On September 30, 2001, Ulley and Vander Horck received information that "Rhino" from La Rana or 204th Street gang may have

been involved with the shooting. They did not receive any solid leads. A neighbor Jeff
Batch, who lived on W. 204th Street, told the Detectives he believed the group consisted
of La Rana and 204th Street gang members because a woman who lived  at 1513 W.
204th Street had a "La Rana" gangster boyfriend named Anthony and Anthony's
girlfriend drove a two-door 1989-90 grey Ford Thunderbird. The T-bird was listed on
a scene diagram.

Ulley consulted with LAPD expert on the 204th St. gang, Officer Maldonado,
regarding the identification of active gangsters in that area. On October 2, 2001,
Maldonado told the Detectives that "Rhino" from 204th Street is Adrian Ernesto Yanez
and is listed in Cal-gangs.[1]  Cal-gangs listed Yanez's description as a male Hispanic,
5' 8" 200 pounds, brown eyes, black hair, and 18 years old.  The detectives received
information that Anthony Robert Pollack, aka "Ghost", 5'7"-5'9", 220 pounds, and
born in 1981, was a known associate of Yanez .  The detectives learned Pollack was
ticketed on December 23, 2000 when he drove the 1989 Thunderbird.

On October 9, 2001, the detectives conducted a tape recorded interview of victim
Jenkins who described the events of the night of the shooting.  Throughout the
investigation the Detectives consistently made tape recordings, wrote notes and type
written statements regarding many of the interviews and documented these activities
in the Chronological Record ("Chrono Log").  Jenkins told the detectives he could
identify the shooter if he saw him again.  Jenkins described the shooter as a male
Hispanic, between 15-17 years old, 5'10" or 5'11" weighing approximately 160
pounds, with a shaved head and two inch scar on the right side of his face.

> **b.    When the Detectives Showed the First Photographic Line-Up
> the Evidence Pointed Toward Mario Martinez, Jr. as the
> Possible Shooter.**

---

[1] Cal-gangs is a gang intelligence database in which gang officers enter
information obtained when they make contact with gang members and their
associates.  The information is limited to use in official law enforcement activities.

6

Based on Jenkins' descriptions, the detectives identified a possible suspect Mario Martinez, Jr., who was listed in the Cal-gangs database as a 204th Street gang member. Cal-gangs described Martinez as 17 years old, 5'8", 150 pounds, with a scar on the right side of his face. On October 11, 2001, Ulley created a photographic display folder with six potential suspects (a six-pack), photo display folder "A," and placed Martinez in the #4 position. He also used two other photo display folders, with 16 and 12 photos of documented 204th Street gang members, photo display folders "B" and "C" respectively, which another officer created in August 2000 for an unrelated murder investigation in which 204th Street gang members were suspects. Photo display folder "B" included a photograph of Plaintiff in position 13, which was at least two years old in which Plaintiff looked much younger and had more hair than at the time of the shooting. However, when the Detectives used photo display "B," they did not realize Plaintiff's photograph was included and at that point, they were not aware of Plaintiff or his affiliation with the 204th Street gang.[2]

Ulley showed Jenkins the three photo displays and followed LAPD's photographic identification procedures and guidelines and gave Jenkins the photographic show-up admonition pursuant to LAPD protocol. Jenkins did not make any positive identifications from any of the three photo displays. The Detectives documented the lack of identification in the Murder Book.

On October 15, 2001, the Detectives interviewed Williams. She described the shooter as a male Hispanic, with a shaved head or minimal hair growth, approximately 5'9", 160 pounds, 18-22 years old, possibly a thin mustache, light to medium complexion, thin nose, and with a mark or tattoo over his left eye. Ulley showed the

---

[2] Ulley also created six-pack photo display "D" with Yanez's photo to see if witnesses could identify anyone from the group of male Hispanics across the street but no one made any identifications of anyone from this photo display. Yanez' photo was placed in position no. 3.

same three photo displays to Williams and gave her the photographic admonition. This information was disclosed.

Ulley also interviewed Flowers. Flowers described the shooter as a male Hispanic with a shaved head between 5'5" and 5'10", weighing between 160 to 180 pounds. The reports reflect Flowers did not identify anyone in any of the photo displays as the shooter.

On October 16, 2001, Ulley interviewed E. Hightower. She described the shooter as a male Hispanic with a shaved head, approximately 5'5" weighing 155 pounds, age 17 or 18, and had a thin mustache, chin hair, and a dark mark or tattoo over his right eyebrow. Ulley read the photographic admonition and showed E. Hightower all three photo displays. She did not positively identify anyone as the shooter either. However, in the six-pack photo display "A" she thought someone other than Martinez looked similar to the shooter and with respect to photo display "B", she thought the person in position 13, later determined to be Plaintiff, shared similar facial features with the shooter. All these facts were included in the Murder Book. Ulley also interviewed White but since White did not see the shooter clearly enough to recognize anyone, Ulley did not show him any of the photo displays.

### c.    The Identification of Plaintiff as the Shooter

On October 16, 2001, the detectives unsuccessfully searched Cal-Gangs to locate a 204th Street or La Rana gang member who matched the descriptions Williams and E. Hightower gave them. The Detectives again consulted with Maldanado who provided a list of nine possible suspects from 204th Street gang, who may fit the general description, who were not in custody on September 29, 2001, and their dates of birth and monikers. The list included Plaintiff, Julio Munoz and Adrian Yanez.

On October 17, 2001, Ulley ran the nine names through Cal-gangs to research their physical descriptions, and distinctive markings such as tattoos, scars, etc. When Ulley ran Plaintiff's name, he saw Milla's moniker was "Drifter", he was a male Hispanic, 19 years old, 5'11", weighing 187 pounds, and had a three-inch scar on his

8

1    head.  Ulley also learned Maldonado field interviewed Plaintiff on October 2, 2001,

2    for loitering in front of 1530 W. 204th Street and another officer filed interviewed

3    Plaintiff on October 3, 2001 for a shots-fired investigation near that location.  Ulley

4    discovered Plaintiff had been arrested on May 7, 2001, for Assault with a Deadly

5    Weapon with a firearm against an African American victim at 204th Street and Harvard

6    Boulevard, approximately a block away from the shooting.  Based on this information,

7    Ulley believed Plaintiff was a possible suspect and created photo six-pack display "E,"

8    with Plaintiff in the number two position.

9           On October 18, 2001, detectives interviewed McCombs.  McCombs stated she

10   saw the shooter because the car was stopped and the shooter stared at them as he walked

11   down the street and passed in front of their car.  As the shooter walked past the group

12   of male Hispanics near 1513 W. 204th Street, McCombs heard him say "I got a nigger"

13   or "I got one nigger because of the calls of the fight."   McCombs described one or

14   possibly two shooters as male Hispanic 5'8" to 5'9", thin build, 20 to 21 years old,

15   shaved head, slightly spiked short black hair, thin moustache and small goatee with a

16   1½ inch vertical scar on the side of his face near his eye, possibly on the left side of his

17   face.  This entire process was documented and disclosed.

18          Detectives next interviewed Fortune.  She did not identify anyone as the shooter

19   and this non-identification process was disclosed.

20          Detectives interviewed Mayfield. She said she did not get a good look at the

21   shooter but thought he was a male Hispanic, 5'9" tall, thin build, 17 to 20 years old,

22   shaved head, wearing a light gray shirt over a long sleeved black shirt and dark pants.

23   Mayfield did not identify anyone as the shooter and this lack of identification was noted

24   and disclosed.

25          On October 22, 2001, detectives showed Jenkins six-pack photo display "E" and

26   read him the photographic admonition.  Jenkins positively identified Plaintiff as the

27   shooter. The Detectives tape recorded the identification process. After they completed

28   the identification process, Ulley re-wound the tape and discovered the sound quality of

                                                9

the tape recording was very poor (muffled).  Thus, the Detectives obtained a different tape and recorder and asked Jenkins to confirm the previous identification process. The Detectives put both the original muffled tape and the confirmation tape into the police file and noted them in the Murder Book. There were also handwritten notes of the identification process, the photo line-up, Jenkins' hand-written statement on the photo identification record, and the page where Jenkins circled a photo of Plaintiff identifying him as the shooter.

Detectives then interviewed E. Hightower and showed her the same six-pack with Plaintiff in the #2 position, and read her the photographic admonition.  E. Hightower tentatively identified Plaintiff as the shooter.  Her identification process was similarly audio taped, documented and disclosed.

Detectives then went to Williams' location and showed her the six-pack photo display "E" and read her the photographic admonition.  When the Detectives showed Williams the six-pack photo display "E", she identified two other people (not Plaintiff) as having similar features as the shooter.

Detectives also showed Flowers and Williams the six-pack photo display "E." These witnesses did not identify anyone as the shooter. Both these non-identifications and Williams' comments were taped record, noted in the Murder Book and disclosed. Detectives investigated other leads too.

### d.    The Detectives Obtain an Arrest/Search Warrant for Plaintiff

Based on Jenkins positive identification, E. Hightower and McCombs' tentative identifications of Plaintiff as the shooter, as well as Plaintiff's May 2001 arrest near the shooting location for assault with a deadly weapon (gun) against an African-American, and the fact that he was near the shooting location on October 2 and October 3, 2001, detectives believed probable cause existed that Plaintiff was the shooter on September 29, 2001.

On October 23, 2001, Ulley prepared an affidavit and search warrant package to submit to a Judge seeking an arrest warrant for Plaintiff, and a search warrant for

Plaintiff's residence in Carson, his Toyota Tacoma pick-up truck, any firearms similar to the weapon used in the crime, similar clothing, and evidence of gang membership.

In the affidavit in support of the warrant, Ulley summarized many of the witnesses' statements and explained why the detectives initially focused on Martinez, Jr., and the witnesses' non-identification of Martinez. The affidavit then described how Plaintiff came to the detectives' attention as set forth above. The affidavit also attached as exhibits to the application, Jenkins' positive identification and E. Hightower and McCombs' tentative identifications of Plaintiff in the six-pack photo display "E". Judge Weisman issued the search and arrest warrant on October 23, 2001.

On October 24, 2001, detectives served the search warrant and arrested Plaintiff at his residence in Carson and seized evidence from Plaintiff's residence or his truck including a BB gun, ammunition, clothing, drugs and evidence of his 204th Street gang membership. Plaintiff's friend, Celedonio "Alex" Velarde (an Artesia 13 gang member), was at Plaintiff's home when the detectives arrested Plaintiff and served the warrant. Velarde agreed to come to the police station to make a voluntary statement. On audio tape Velarde denied knowledge of the murder and said he and Plaintiff were at Plaintiff's girlfriend, "Sandra's" apartment in Downey that evening. In another taped recorded statement, Plaintiff waived his Miranda rights and denied knowledge of the murder claiming he was at his girlfriend Sandra Jauregui's that night. These tapes and the content of the statements were noted in the Murder Book and on reports that the Detectives disclosed to the District Attorney's Office.

On October 25, 2001, Jauregui visited Plaintiff in jail. Vander Horck obtained Jauregui's contact information so the Detectives could interview her. Later that day, detectives presented the case to Assistant Deputy District Attorney Scott Carbaugh for filing. On October 25, 2001, Carbaugh filed one count of murder of R. Hightower and five counts of attempted murder of Flowers, Jenkins, White, E. Hightower, and Williams, among other special allegations.

/ / /

11

### e.    The Detectives Investigated Plaintiff's Alibi

The Detectives efforts to continue the investigation after DDA Carbaugh filed the case are documented in the Chrono Log which was disclosed. The Detectives investigated Plaintiff's alibi and compared the physical evidence of the crime scene to Plaintiff's fingerprints.  Ultimately, no physical evidence tied Plaintiff to the crime scene.  The detectives contacted Jauregui and she agreed to be interviewed on November 6, 2001.  However, on November 6, Jauregui did not appear for the interview.  Detectives again called Jauregui and left messages for her on November 6. When detectives called Jauregui again on November 8, 2001, the phone would not accept more voicemail messages. Jauregui's then-roommate, Irma Navarro, refused to speak with detectives on November 13 and 14, 2001.  On November 14, 2001, Detectives also spoke to Navarro's neighbors to gather more information about Plaintiff's alibi witness, "Andrew", whom Plaintiff identified in his statement, without any luck.

On November 13, 2001, the detectives interviewed Yanez who stated he knew about the shooting but said he was not there when it happened. Finally, detectives continued to door knock, call and leave messages for other potential witnesses throughout November, 2001, which yielded no new information.

### f.    The Detectives Produced Their File to the District Attorney's Office and Complied with Discovery Requests.

Throughout the course of the investigation, the Detectives continuously complied with discovery requests and produced their files to the District Attorney's Office and documented same in the Chrono Log.  For example, the Detectives provided copies of the Murder Book and Chrono Log, copies of tape recorded interviews, and other evidence to the District Attorney's Office on multiple occasions. The Detectives also responded to Plaintiff's criminal defense attorney's discovery requests for documents, evidence relating to Plaintiff and other potential suspects including Julio Munoz, and requests for interviews of witnesses.

### g.   The Witnesses Positively Identified Plaintiff as the Shooter at the Preliminary Hearing and Jury Trial

At the preliminary hearing, Jenkins, E. Hightower, Maldonado and Vander Horck testified.  A stipulation regarding Det. Ulley's testimony was read into the record. Ulley's testimony impeached, in part, the testimony of E. Hightower.  Jenkins and E. Hightower both positively identified Plaintiff as the shooter. During the hearing Jenkins and E. Hightower were shown the photo displays and their handwritten photo identification records and were questioned by Plaintiff's criminal defense attorney. The court held Plaintiff to answer to all charges at the end of the preliminary hearing.

A jury trial began on December 2, 2002.  Rosales was the prosecutor and Brown was Plaintiff's criminal defense attorney.  Jenkins, E. Hightower, and McCombs, testified and positively identified Plaintiff in court.  Brown called an expert regarding the potential failings of eye witness identifications.  Plaintiff called witnesses to testify but did not call alibi witnesses or Julio Munoz.  Brown had the opportunity to question all the witnesses.  On December 23, 2002, the jury found Plaintiff guilty of all counts. In August 2003, the Court sentenced him to life without parole after denying Plaintiff's motion for new trial.

### h.   Post-Trial Proceedings

On June 18, 2003, Plaintiff filed a motion for new trial on the grounds of newly discovered evidence and ineffective assistance of counsel.  Plaintiff argued he discovered a new witness, 17 year old Maria F., who had never come forward out of fear of gang retaliation, and she testified that she observed the shootings and identified the shooter as Julio Munoz, aka "Downer" from 204th Street gang.  Maria F. was a cousin of the mother of one of Plaintiff's children.  Both Navarro and Jauregui testified that Plaintiff was at their apartment in Downey on the night of the shootings.  Finally, Jauregui provided a declaration and testimony that after 10 p.m. on the night of the shootings, Munoz, came to Plaintiff's apartment and told Plaintiff he was the shooter.  Plaintiff also attacked the quality of the photographic identification process.   On

August 1, 2003, the trial court denied the motion for new trial. Plaintiff appealed the trial court's ruling. On December 20, 2004, the Court of Appeal affirmed the guilty verdict and the trial court's denial of the motion for new trial in an unpublished opinion.

### i.   Habeas Proceedings and the Finding of Factual Innocence

On March 14, 2006, Plaintiff filed a federal habeas petition on similar grounds on which he filed the appeal of the denial of the motion for new trial. The United States District Court denied the petition on or about June 24, 2008.

In mid to late 2010 it was disclosed that a person trying to get out of the gang life and into witness protection program had information claiming he had proof that Plaintiff did not commit the shootings on 204th Street. This person, Salvador Pimentel, claimed Julio Munoz "Downer" was the actual shooter.

On or about January 18, 2012, Plaintiff filed a Petition for Writ of Habeas Corpus in the Los Angeles Superior Court, based on the information provided by Pimentel. At the conclusion of an evidentiary hearing, on June 25, 2014, the court issued a writ of habeas corpus, vacated Plaintiff's conviction, and ordered a new trial on the ground that the information provided by Pimentel was new evidence. The court did not grant the petition due to police misconduct. On January 10, 2015, the District Attorney's Office dismissed the case pursuant to *Penal Code* § 1368. On July 30, 2015, Plaintiff filed a Petition for Finding of Factual Innocence and Related Relief which the trial court granted on or about January 11, 2016.

Plaintiff filed this lawsuit on or about August 17, 2015. The operative second amended complaint alleges three claims in violation of 42 U.S.C. § 1983: 1) violation of the Fourth Amendment – unlawful imprisonment; 2) violation of the Fourth Amendment – malicious prosecution; 3) *Monell* claim against the City. Ulley is the only remaining individual defendant.[3] However, there is no evidence to support these

---

[3] Plaintiff named LAPD Detective John Vander Horck as a Defendant. On 10/24/16, doc. 36, this Court dismissed him pursuant to Fed. R. Civ. P., rule 4(c). Plaintiff appealed that ruling to the Ninth Circuit in case number 16-56753.

claims because the order granting a factual finding of innocence was based on new evidence, not on any alleged misconduct or mistakes by the Detectives.

**D.** **Defendants' Counterclaims and Affirmative Defenses**

*First Affirmative Defense*: Qualified Immunity (federal)

**E.** **Elements to Affirmative Defenses**

*First Affirmative Defense*: Qualified Immunity

1. Whether Defendant officers' alleged conduct violated a constitutional right;

2. If a constitutional right was violated, whether the constitutional right was "clearly established."

*See Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1020 (9th Cir. 2009).

**F.** **Defendants' Evidence in Support of Each Affirmative Defense**

Defendants believe that the same evidence set forth under Section C above supports their affirmative defense of qualified immunity in this matter.

**G.** **Evidentiary Issues**

Defendants do not believe that they will have any evidentiary problems with their defense. However, Defendants believe that Plaintiff may have evidentiary problems with their claims, as they may try to introduce hearsay, irrelevant and other inadmissible evidence to support their claims. Defendants have filed the following motions in limine so that the Court may preclude some of the inadmissible evidence that Defendants anticipate that Plaintiffs will attempt to introduce:

1. To preclude evidence that Julio Munoz is the actual shooter;

2. To preclude evidence that Salvador Pimentel was found to be a reliable informant or credible by a court;

3. To preclude evidence regarding national events and media involving law enforcement; and

4. To preclude evidence that Plaintiff was found to be factually innocent.

/ / /

**H.**    <u>**Issues of Law**</u>

    **1.**    <u>**Defendants Did Not Violate Plaintiff's Fourth Amendment Rights.**</u>

To prove a claim for malicious prosecution, Plaintiff "must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995). Mere negligence is insufficient to support a 42 U.S.C. § 1983 claim. *Daniels v. Williams* 474 U.S. 327, 328 (1986). "Probable cause exists if the arresting officers had knowledge and reasonably trustworthy information of facts and circumstances sufficient to lead a prudent person to believe that the [arrestee] had committed or was committing a crime." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097-98 (9th Cir. 2013) (quoting *Maxwell v. City of San Diego*, 697 F.3d 941, 951 (9th Cir. 2012). In addition, where the arrest is based on a facially valid arrest/search warrant, probable cause is presumed unless it was procured by fraud or judicial deception.

Since Plaintiff was arrested pursuant to a warrant and a judge found probable cause to hold Plaintiff to answer after a preliminary hearing, Plaintiff's action is barred by the doctrine of issue preclusion because it is undisputed that the issues determined at Plaintiff's preliminary hearing were identical to the issue of whether there was probable cause to arrest him. In responses to interrogatories, Plaintiff confirmed the evidence presented at his preliminary hearing was the same as the evidence presented in support of the application for the warrant. *See Haupt v. Dillard*, 17 F.3d 285, 289 (9th Cir. 1994).

"In California, issue preclusion applies when five requirements are met: (1) the issue sought to be relitigated must be identical to the issue decided in the earlier action; (2) the issue must have been actually litigated and (3) necessarily decided in the earlier action; (4) the earlier decision must be final and made on the merits; and (5) the party against whom issue preclusion is asserted must have been a party to the earlier action or in privity with such a party. As a general rule, each of these requirements will be

met when courts are asked to give preclusive effect to preliminary hearing probable cause findings in subsequent civil actions for false arrest and malicious prosecution." *Wige v. City of Los Angeles*, 713 F.3d 1183, 1185 (9th Cir. 2013) (citations omitted). The entire cause of action for Malicious Prosecution fails for this reason. However, since the Second Amended Complaint alleges Defendants engaged in deliberate fabrication of evidence, violated their *Brady* obligations, and pressured the District Attorney's office to file the criminal case, those issues are discussed below.

Plaintiff alleges as part of this malicious prosecution claim that his rights were interfered with because the officer deliberately fabricated evidence. Plaintiff has no facts to establish this claim. To support a claim for deliberate fabrication of evidence[4], Plaintiff must produce evidence of at least one of two theories: "(1) Defendants continued their investigation of [the plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Deveraux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

Plaintiff claims the photographic displays were unduly suggestive because he appeared in two photographic displays, "B" and "E". The use of these identification cards does not establish that the Defendant officers in fact knew or should have known Plaintiff was innocent. In evaluating whether a photographic line-up is unduly suggestive or otherwise improper, courts look at the "totality of the circumstances" and evaluate the following factors: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the

---

[4] Plaintiff's responses to discovery and the legal conclusions state support a contention of Negligence. UF 86

confrontation." *United States v. Hammond*, 666 F.2d 435, 440 (9th Cir. 1982) (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

A suspect's mere appearance in multiple photographic arrays or line-ups does not automatically make the identification procedure suggestive. For example, in *Simmons v. United States*, 390 U.S. 377 (1968), during its investigation of a bank robbery, the FBI obtained at least six group photographs in which the two primary suspects appeared in multiple photographs, which they showed to the bank employees the day after the crime. When the FBI agents re-interviewed the employees a few weeks later, the witnesses again identified Simmons as one of the robbers and they all identified him as one of the robbers at trial. *Id.* at 380-81. The jury found Simmons guilty and Simmons appealed claiming the pretrial photographic identification process was improperly suggestive. The Supreme Court affirmed the conviction and found that the photographic identification process was not unduly suggestive and did not deny Simmons due process of law. *Id.* at 385. The Supreme Court noted "Each witness was alone when he or she saw the photographs. There is no evidence to indicate that the witnesses were told anything about the progress of the investigation, or that the FBI agents in any other way suggested which persons in the pictures were under suspicion." *Id*.

Similarly, in *United States v. Portillo*, 633 F.2d 1313 (9th Cir. 1980), after a jury found defendant Daniel Chavez Montellano guilty of an armed bank robbery, Montellano challenged the conviction in part based on an unduly suggestive photographic identification process. Montellano was the only suspect whose picture was displayed in the photographic display and who also participated in an in-person line-up. Montellano also complained that the photographic array was impermissibly suggestive because only he and one other person in the array were of Mexican descent. The Ninth Circuit rejected both arguments noting "Appellant has not asserted that the features of the non-Mexican individuals were so distinct from his as to single him out. Reasonable people can differ as to what makes a person appear to be Spanish, Mexican,

Indian, Italian or Iranian, or a member of any other national group possessing Mediterranean, Indian or Semitic features. We…. do not find [the photospread] to be suggestive. Likewise, we reject appellant's unsupported argument that being the only individual to appear in both the photospread and the line-up violated his due process rights." *Id*. at 1324.

Here, the witnesses to whom the Detectives showed the photographic displays, had an opportunity to observe the shooter and provided descriptions to the detectives. The Detectives showed the first set of photographs to each witness separately within two weeks of the crimes. The detectives created the six-pack photographic array, "E," and showed it individually to Jenkins, Flowers, E. Hightower, McCombs, Mayfield and Fortune between the dates of October 18-22, 2001. The Detectives taped recorded and disclosed the identification procedures. There is no information that the Detectives discussed the case or other identifications with other witnesses.

The only witnesses that made any identifications were Jenkins (positive identification), E. Hightower and McCombs (tentative identifications). Even though Flowers and Williams saw the earlier photographic display that included Plaintiff they did not make an identification. In each of the photographic arrays, none of the facial features or clothing worn by the individuals were that distinctive or different from Plaintiff's appearance as to make him stand out. All of the individuals in all of the photographic displays were "Hispanic males in the same age range with similar skin, eye, and hair coloring. Each had approximately the same hair length. [Many] had a moustache." *United States v. Carbajal*, 956 F.2d 924, 929 (9th Cir. 1992). Thus, Plaintiff's "allegations of the use of improper, unreliable and suggestive identification procedures turn out upon examination to be without adequate factual support. Surmise, conjecture, theory, speculation and an advocate's suppositions cannot 'so duty for probative facts' and valid inferences." *McSherry v. City of Long Beach*, 584 F.3d 1129, 1136 (9th Cir. 2009) (quoting "*Poppell v. City of San Diego*, 149 F.3d 952, 962 (9th Cir. 1998).

1    Plaintiff has no evidence that the detectives used investigative or interview

2    techniques that were so coercive or abusive that they would yield false evidence. When

3    the Detectives interviewed the various witnesses and victims, they asked open ended

4    questions about what the witnesses saw, and did not suggest that the shooter looked

5    one way or another.    When the Detectives showed the witnesses the various

6    photographic line-ups, they did not arrange or show them in such a way that suggested

7    a "correct" answer.    Each time the Detectives showed the witnesses photos, they

8    followed LAPD protocol by reading the admonitions and never asked a witness to

9    identify Plaintiff.  Thus, this claim fails.

10    Plaintiff also contends the Detectives Ulley did not properly investigate his alibi

11    or investigate Julio Munoz.  However, there is no evidence to support this claim.  As

12    noted above, Plaintiff and Velarde provided an alibi claiming they were at Plainitff's

13    girlfriend "Sandra's" apartment in Downey with Sandra's roommate Irma, and

14    someone named Andrew was also there.  Plaintiff provided the Detectives Sandra and

15    Irma's telephone numbers.  The Detectives contacted Jauregui, who did not come to

16    an agreed upon meeting and did not return the Detectives telephone calls to reschedule.

17    The Detectives also tried to contact Navarro without success.  Thus, the Detectives

18    tried but were never able to independently verify or otherwise corroborate Plaintiff's

19    alibi.  That Plaintiff gave the Detectives an alibi does not mean they were required to

20    believe it or ignore the other evidence they had that pointed to Plaintiff as the shooter.

21    (Plaintiff did not tell the police Downer was the actual shooter.) Police officers "must

22    be given some latitude in determining when to credit witnesses' denials and when to

23    discount them, and we are not aware of any federal law . . . that indicates precisely

24    where the line must be drawn." *Devereaux*, *supra*, 263 F.3d at 1075.

25    In addition, no one told the Detectives that Munoz purportedly came to

26    Jauregui's house after the shooting and bragged that he was the shooter.  Thus, the

27    Detectives failure to obtain corroborating evidence about Plaintiff's alibi or that

28    someone else committed the crime, does not rise to the level of a constitutional

violation. "A police officer's failure to preserve or collect potential exculpatory evidence does not violate the Due Process Clause unless the officer acted in bad faith." *Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003). Thus, summary adjudication of this issue is appropriate.

Plaintiff contends probable cause did not exist to issue the arrest warrant and/or Ulley provided false or misleading evidence in his affidavit in support of his request for the warrant. However, if the arrest warrant is facially valid, the arresting officer enjoys qualified immunity unless 'the warrant application is so lacking in indicia of probable cause as to render official belief in its existing is unreasonable . . . ." *Smith v. Almada*, 640 F.3d 931, 937 (9th Cir. 2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986).) "'Omissions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause.' Nor may a claim of judicial deception be based on an officer's erroneous assumptions about the evidence he has received." *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009) (quoting *United States v. Smith*, 588 F.2d 737, 740 (9th Cir. 1978). Here, a judge signed the warrant for Plaintiff's arrest.

To the extent Plaintiff bases this claim on the photographic identification process, his claim fails for the reasons set forth above. Plaintiff may also attempt to argue that the Detectives improperly focused their investigation on Plaintiff. However, there is no evidence to support this claim. The detectives followed the information and descriptions given to them. Probable cause existed for the Detectives to request an arrest warrant of Plaintiff based on Jenkins' positive identification, E. Hightower and McCombs' tentative identifications of Plaintiff as the shooter. In addition, the affidavit in support of the warrant outlined the entire process that led to Plaintiff's identification, including his physical description, gang affiliation, acne scars, prior arrest and presence at the location within days of the shooting.

Plaintiff may argue the Detectives' failure to explain in the warrant application that they showed witnesses additional photographs in the first set of displays that also

1  included Plaintiff constitutes a material omission / misrepresentation that negates
2  probable cause.  However, this is not a material omission that would have led the judge
3  to deny the request for the warrant.  There is no requirement that an officer seeking a
4  search warrant include all exculpatory details in the search warrant as long as probable
5  cause exists to support the arrest.  "The Government need not include all of the
6  information in its possession to obtain a search warrant . . . . The omission of facts rises
7  to the level of misrepresentation only if the omitted facts 'cast doubt on the existence
8  of probable cause.'"  *Ewing v. City of Stockton*, 588 F.3d 1218, 1226 (9th Cir. 2009)
9  (quoting *United States v. Johns*, 948 F.2d 599, 606-07 (9th Cir. 1992) and citing *United*
10  *States v. Colkely*, 899 F.2d 297, 302 (4th Cir. 1990) (omission of a non-identification
11  from a photo spread was not material and the Fourth Amendment does not require all
12  potentially exculpatory evidence to be included in an affidavit for a search warrant).

13  If a facially valid search warrant contains probable cause, "[t]o maintain a false
14  arrest claim for judicial deception, a plaintiff must show that the officer who applied
15  for the arrest warrant 'deliberately or recklessly made false statements or omissions
16  that were material to the finding of probable cause.' The materiality element – a
17  question for the court, - requires the plaintiff to demonstrate that 'the magistrate would
18  not have issued the warrant with false information redacted, or omitted information
19  restored.'"  *Smith v. Almada*, 640 F.3d 931, 937 (9th Cir. 2011).

20  Here, Plaintiff concedes he has no evidence that any defendant deliberately or
21  recklessly made false statements or omissions relating to a probable cause
22  determination. (UF 71, 72, 80, and 81) Instead, Plaintiff argues the inconsistencies in
23  the descriptions of the shooter and the Detectives' continued focus on Plaintiff as the
24  shooter was in bad faith and could not support a probable cause finding.  However, this
25  evidence, without more, cannot support a claim for a violation of 42 U.S.C. § 1983.
26  *McSherry v. City of Long Beach*, 584 F.3d 1129, 1135-36 (9th Cir. 2009) In *McSherry*,
27  the Ninth Circuit found police officers did not act in bad faith and did not violate 42
28  U.S.C. § 1983 when they pursued a suspect where the victims gave inconsistent

descriptions of the perpetrator of the crime because "police officers 'must be given some latitude in determining when to credit witnesses' denials and when to discount them and we are not aware of any federal law . . . that indicates precisely where the line must be drawn.' [The police officers] do not dispute that McSherry did not closely resemble the initial descriptions given by the two children, however, nothing in the record shows that the officers acted in bad faith by relying on the children's photo lineup identification of McSherry rather than their initial descriptions." *Id*. at 1135-36 (9th Cir. 2009). As stated above the arrest was based upon the identification of Milla as the perpetrator; he appeared to have motive (gang membership and the racially motivated crime), access to weapons (prior arrests and gun cases and ammunition found at his house), he associated with the gang in that area, and he was not in custody at the time of the crime.

"Filing of a criminal complaint immunizes investigating officers . . . from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time." *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir. 1981) ("*Smiddy I*"). Although this presumption may be rebutted, "[t]he plaintiff bears the burden of producing evidence to rebut such presumption." *Newman v. County of Orange*, 457 F.3d 991, 993 (9th Cir. 2006). "Among the ways that a plaintiff can rebut a *prima facie* finding of probable cause is by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith. . . . ¶ . . . [T[he presumption of prosecutorial independence does not bar a subsequent § 1983 claim against state or local officials who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of the legal proceedings." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004).

Here, Plaintiff has no evidence to rebut this presumption other than his claim of innocence. (See UF 73-77). Plaintiff has no information regarding what documents were presented to the DA or that the DA was pressured or coerced.

Moreover, "a suspect's account of an incident, by itself, is unlikely to influence a prosecutor's decision, and thus, it cannot by itself, serve as evidence that officers interfered with the prosecutor's decision. ¶¶ . . . To rebut the presumption of independent judgment and to survive summary judgment on a malicious prosecution claim, a plaintiff must provide more than an account of the incident in question that conflicts with the account of the officers involved." *Newman v. County of Orange, supra*, 457 F.3d at 995.

When the Detectives presented the case to DDA Carbaugh, they gave him the Murder Book containing the photographic line-ups, E. Hightower and McCombs' tentative identifications, and Jenkins positive identification of Plaintiff as the shooter. The Detectives also gave Carbaugh their October 24, 2001 Follow-Up Investigation which discussed the above referenced information, including Plaintiff's denial of knowledge of the murder, and denial of being present on 204th Street on September 29, 2001. The Follow-Up Investigation report also included all of the witnesses' descriptions of the shooter, as well as the witnesses' non-identification of Plaintiff as the shooter. The Detectives never pressured Carbaugh to file charges against Plaintiff. Thus, Carbaugh's independent filing decision cuts off Plaintiff's claims against Defendants.

## 2. <u>At a Minimum, the Defendant Officers are Entitled To Qualified Immunity.</u>

Defendants are entitled to qualified immunity since they did not violated Plaintiffs' Fourth Amendment rights and his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

/ / /

1     Qualified immunity is a judicially created doctrine that stems from the
2  conclusion that few individuals will enter public service if such service entails the risk
3  of personal liability for one's official decisions.  *See Wyatt v. Cole*, 504 U.S. 158, 167-
4  68 (1992).   Qualified immunity "spare[s] a police officer not only unwarranted
5  liability, but unwarranted demands customarily imposed upon those defending a long
6  drawn out lawsuit." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).  It is an "an immunity
7  from suit rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 200
8  (2001) (*quoting Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis original).  As
9  a result, the Supreme Court has repeatedly stressed the importance of resolving
10  immunity questions at the earliest possible stage in litigation.  *Id*. at 201 (*quoting
11  Hunter*, *supra*, 502 U.S. at 227).
12     Qualified immunity balances "two important, competing interests: the need to
13  hold public officials accountable for irresponsible actions, and the need to shield them
14  from liability when they make reasonable mistakes." *Morales v. Fry*, 873 F.3d 817,
15  822 (9th Cir. 2017).  Qualified immunity protects officials "who act in ways they
16  reasonably believe to be lawful." *Garcia v. County of Merced*, 639 F.3d 1206, 1208
17  (9th Cir. 2011) (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987). "The
18  qualified immunity standard 'gives ample room for mistaken judgments' by protecting
19  'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v.
20  Bryant*, 502 U.S. 224, 229 (1991) (per curiam) (*quoting Malley v. Briggs*, 475 U.S.
21  335, 343, 341 (1986)).   "If the officer's mistake as to what the law requires is
22  reasonable . . . the officer is entitled to the immunity defense." *Saucier*, *supra*, at 205.
23  The Ninth Circuit also has held that a police officer is entitled to qualified immunity if
24  a reasonable officer could have believed, even mistakenly so, that the officer's actions
25  were justified so long as the officer's conclusion is objectively reasonable.  *Act
26  Up!/Portland v. Bagley*, 988 F.2d 868, 872 (9th Cir. 1993); *Franklin v. Fox*, 312 F.3d
27  423, 439 (9th Cir. 2002).
28  / / /

1  There are two prongs to the qualified immunity analysis.  The courts may
2  exercise their discretion in deciding which prong to analyze first under the facts of the
3  case at bar.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  The first inquiry is
4  whether, taken in the light most favorable to the non-moving party, the facts alleged
5  show that the officer's conduct violated a constitutional right.  *Saucier*, supra, 533 U.S.
6  at 201.  Where the alleged conduct does not violate a constitutional right, the officer is
7  entitled to qualified immunity.  *Id.*  The law is clear that an officer may use deadly
8  force to apprehend a suspect where the suspect poses an immediate threat to the officer
9  or others.  *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).  To succeed on a Section 1983
10  action against a defendant in his individual capacity, the plaintiff must present specific
11  facts linking the individual defendant to a constitutional violation.  *Ortez v. Washington*
12  *County*, 88 F.3d 804, 809 (9th Cir. 1978).

13  Under the first prong, Defendant officers are entitled to qualified immunity
14  because he did not violate Plaintiff's constitutional rights under the circumstances of
15  the subject incident.  Plaintiffs cannot present any specific facts linking Defendant
16  officers to a constitutional violation.

17  Even if the Court determines that there is a genuine material dispute as to
18  whether Plaintiffs' constitutional rights were violated, the Court must consider the
19  second prong of the qualified immunity doctrine.  Under the second prong, the Court
20  must determine whether the conduct violated a "clearly established statutory or
21  constitutional right of which a reasonable person would have known."  *Hope v. Pelzer*,
22  536 U.S. 730, 739 (2002); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Wood v.*
23  *Ostrander*, 879 F.2d 583, 591 (9th Cir. 1989).  The plaintiff bears the burden of proving
24  that the constitutional right allegedly violated was clearly established at the time of the
25  alleged incident.  *Cohen v. San Bernardino Valley College*, 92 F.3d 968, 973 (9th Cir.
26  1996).

27  This line of inquiry must be "undertaken in light of the specific context of the
28  case, not as a broad general proposition . . .," with the focus being on "whether it would

be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, *supra*, 533 U.S. at 201.    The courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).    "'[C]learly established' also should not be defined 'at a high level of generality.'"  *White v. Pauly*, 137 S. Ct. 548, 552 (2017).  "Clearly established" must be particularized to the facts of the case and "in light of the pre-existing law the unlawfulness must be apparent". *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Defendant officers are entitled to qualified immunity under the second prong because the constitutional right allegedly violated was not clearly established at the time of the alleged violation.  There is no evidence the Detectives knew or should have known that there was not probable cause to arrest Plaintiff.  There is no evidence that the Detectives falsified their investigation, ignored or hid exculpatory evidence, or that they conducted their investigation in an improperly coercive or suggestive manner. The Detectives had probable cause to believe Plaintiff committed the shooting in 2001 based on his description, their knowledge of him as a 204th Street gang member, his earlier arrest, his presence near the shooting just days later, and the eye witness identifications.  The Detectives had no reason to believe Julio Munoz committed the shooting because no one came forth with that information.    Furthermore, the detectives' creation of the photo line-ups themselves, the manner of presentation of them to the witnesses, their diligent documentation and tape recording of the identification procedures were within the contours of the clearly established law. The detectives acted reasonably and not certainly not incompetently.

### 3.  The City of Los Angeles is Not Liable Under *Monell*, As It Did Not Ratify Any Alleged Unconstitutional Acts of Defendant Medina.

To establish liability against a City for a violation of 42 U.S.C. § 1983, it is not sufficient to prove a constitutional violation occurred, rather, to create municipal

liability, Plaintiff must prove the City engaged in a custom, policy, or practice of violating someone's constitutional rights. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978) (To establish municipal liability, plaintiff must allege that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."). "A municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of the County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1996). If a plaintiff seeks to hold a municipality liable for a policy or custom that has not been officially approved by the appropriate policy or decision maker, plaintiff must prove "that the relevant practice is so widespread as to have the force of law." *Id*. at 404 (citing *Monell*, *supra*, 436 U.S. at 690-91). Here, there is no evidence that any alleged constitutional violation was based on any policy, custom, or practice of the City or LAPD.

## I.    JURY TRIAL

Defendants contend that the issues in this case are appropriate for a jury trial, and that a jury trial has been properly requested.

## J.    ATTORNEYS' FEES

The prevailing party on the federal claims may be entitled to recover attorney's fees under 42 U.S.C. § 1988.

## K.    ABANDONMENT OF ISSUES

Defendants have not abandoned any of their defenses and reserve their right to assert further defenses or abandon any defenses as Plaintiffs' contentions become known.

/ / /

/ / /

/ / /

/ / /

/ / /

## L.    **<u>CONCLUSION</u>**

Defendants reserve the right to supplement their contentions and file an amended memorandum of contentions of fact and law as the Court's rulings, Plaintiff's contentions, and/or other evidence, becomes known to Defendants.

DATED: September 27, 2019        **MICHAEL N. FEUER**, City Attorney
**KATHLEEN A. KENEALY**, Chief Asst. City Attorney
**SCOTT MARCUS**, Chief, Civil Litigation Branch
**CORY M. BRENTE,** Senior Asst. City Attorney

By:  _____ */s/ Matthew W. McAleer* _____
**MATTHEW W. McALEER**, Deputy City Attorney
*Attorneys for Defendant,* **CITY OF LOS ANGELES**
**RICHARD H. ULLEY** and **J. VANDER HORCK**

**PROOF OF SERVICE**

I, **KATHERINE FINAN**, declare as follows:

I am over the age of 18 years, and not a party to this action.  My business address is 200 North Main Street, City Hall East, 6th Floor, Los Angeles, California 90012, which is located in the county where the mailing described below took place.

On September 27, 2019, I served the foregoing document(s) described as: **DEFENDANTS' REVISED MEMORANDUM OF CONTENTIONS OF FACT AND LAW** on all interested parties in this action:

**Attorney for Plaintiff:**
Edmont T. Barrett, Esq.
LAW OFFICE OF EDMONT BARRETT
5150 East Pacific Coast Highway, 2nd Floor
Long Beach, CA 90804
etb@barrettlaw.us

I served a true copy of the document(s) above:

[X] **By United States mail**. I enclosed the documents in a sealed envelope or package addressed to the person(s) at the address(es) mentioned above and:

[X] placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage full prepaid.

[X] **By e-mail or electronic transmission**. Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent to the person(s) at the e-mail address(es) listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[X] I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

[X] I hereby certify under the penalty of perjury that the foregoing is true and correct.

Executed on September 27, 2019 at Los Angeles, California.

_____
/s/ *Katherine Finan*
**KATHERINE FINAN**, Declarant