**LAW OFFICES OF MARTIN STANLEY**
Martin Louis Stanley, Esq. [State Bar No.: 102413]
137 Bay Street, No. 2
Santa Monica, CA 90405
Telephone:  (310) 399-2555
Facsimile:  (310) 399-1190

Edmont T. Barrett [State Bar No.: 74117]
Park Tower – Second Floor
5150 East Pacific Coast Highway
Long Beach, California 90804
Telephone:  (562) 597-3070
Facsimile:  (562) 494-1132

Attorneys for Plaintiff MARCO ANTONIO MILLA

(SPACE BELOW FOR FILING STAMP ONLY)

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCO ANTONIO MILLA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>CITY OF LOS ANGELES, a municipal entity; LOS ANGELES POLICE DEPT., a municipal entity; DETECTIVE R. ULLEY, AND DETECTIVE J. VANDER HORCK, and DOES 1 through 10, inclusive<br><br>　　　　　Defendants. | CASE NO.: CV16-134-R (AJWx)<br><br>Judge:  Hon. Stephen V. Wilson<br>Magistrate: Hon. Andrew J. Wistrich<br><br>**PLAINTIFF'S BRIEF ON THE ISSUE OF THE PROSECUTOR'S INDEPENDENT JUDGMENT** |

TO THE COURT, AND TO ALL PARTIES OF RECORD HEREIN:

Pursuant to the court's *In Chambers Order for Supplemental Briefing* of March 23, 2020, petitioner Marco Antonio Milla submits the following memorandum concerning the issue of the prosecutor's independent judgment:

/ / /

/ / /

/ / /

# **TABLE OF CONTENTS**
Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PLAINTIFF'S BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1. THE PROSECUTOR WAS EITHER GIVEN MISLEADING INFORMATION OR NOT GIVEN ALL INFORMATION NEEDED TO MAKE AN INDEPENDENT JUDGMENT . . . . . . . . . . . . . . 1

    A. Chronological Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    B. Follow-Up Investigation Report dated 10/25/01. . . . . . . . . . . . . . . . 4
    C. The Detectives' Deposition Testimony . . . . . . . . . . . . . . . . . . . . . . . 5
    D. Internal Review by District Attorney Involving Police Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

2. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Beck v. City of Upland*
    527 F.3d 853 (9th Cir. 1981) ................................... 1, 2

*Flake v. County of Maricopa*,
    No. 18-16652, 18-16827 (9th Cir. 2020). ............................ 2

*Smiddy v. Varney* (*Smiddy I*)
    665 F.2d 261 (9th Cir. 1981) ..................................... 1

*Smiddy v. Varney* (*Smiddy II*)
    803 F.2d 1469 (9th Cir. 1986) .................................... 1

*Yeager v. Bowlin*,
    693 F.3d 1076 (9th Cir. 2012) ................................... 12

### OTHER AUTHORITIES

Federal Rules of Evidence, Rule 301 ..................................... 2

1. **THE PROSECUTOR WAS EITHER GIVEN MISLEADING INFORMATION OR NOT GIVEN ALL INFORMATION NEEDED TO MAKE AN INDEPENDENT JUDGMENT**

The underlying criminal prosecution against Milla was the result of information given to the filing deputy district attorney, Scott Carbaugh, at the "filing meeting" on October 25, 2001. As is shown here-in-after, that information was ". . . not quite accurate and is misleading." (Dkt. 64-1 at 23.)

In *Smiddy v. Varney*, 665 F.2d 261, 266-265 (9th Cir. 1981) (*Smiddy I* ),[1] the court held that there is a rebuttable presumption that a prosecutor exercises independent judgment regarding the existence of probable cause in filing a complaint. This presumption can be overcome, for example, by evidence that the officers knowingly submitted false information or pressured the prosecutor to act contrary to his independent judgment.[2]

In so holding, the Ninth Circuit gave the following guidelines concerning the presumption of independence:

> "There is a presumption of independence on the part of the district attorney where plaintiff has not presented evidence to challenge that presumption. For example, plaintiff might contend that **the prosecutor acted under pressure from the police or relied on the police investigation and arrest when he filed the complaint, instead of making an independent judgment** on the existence of probable cause for the arrest. [Citation]. Where the plaintiff has introduced evidence to rebut the presumption, the burden remains on the defendant to prove that an independent intervening cause cuts off his tort liability. *Fed.R.Evid.* 301. If for reasons of privilege or otherwise the relevant evidence is not available, no presumption will arise." (*Id.* at 267 - 268.)

///

---

[1] Overruled on other grounds by *Beck v. City of Upland*, 527 F.3d 853, 865 (9th Cir. 2008).

[2] See also *Smiddy v. Varney*, 803 F.2d 1469, 1471 (*Smiddy II*).

See, also, *Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008) finding the presumption is rebutted when e.g. the prosecutor "relied on the police investigation and arrest when he filed the complaint instead of making an independent judgment on the existence of probable cause for the arrest…" and when the prosecutor takes the privilege, '[c]ritical evidence necessary to rebut the Smiddy I presumption of independence is therefore unavailable." Here, like in *Beck*, critical evidence is unavailable because there is no testimony from any prosecutor whatsoever showing that there was any independent review of the evidence or any further investigation by them. Cf. *Flake v. County of Maricopa*, No. 18-16652, 18-16827 (9th Cir. 2020). As in *Beck*, then, plaintiff here "is not required to rebut the presumption of prosecutorial independence."

The evidence in this case: (1) establishes that the defendant police officers submitted incomplete or false information to the district attorney, in which case the presumption does not arise (*Id*. at 267.); and / or, (2) rebuts the presumption of independent judgment by the district attorney in filing the charges against Milla.

Prior to meeting with the district attorney to present the case for filing, the investigating detectives prepared two documents which contradict each other and bear on the question of whether the filing district attorney based his decision on independent judgment.[3] The first is the *Chronological Record*[4] which details their investigation, and the second is the *Follow-Up Investigation Report*[5] presented to the filing Deputy District Attorney.

/ / /

---

[3] Exhibits A through E are contained in the *Appendix of Exhibits* filed and served concurrently herewith.

[4] Exhibit A is a true and correct copy of the *Chronological Record* detailing all police investigation up to and after to the filing meeting with the deputy district attorney that filed the charges against Milla. Ex. A is also found at Dkt. 60-1 at 12-48.

[5] Exhibit B is a true and correct copy of the *Follow-Up Investigation Report*, dated 10/25/01. This report was prepared prior to meeting with the filing deputy district attorney in the afternoon of 10/25/01.

### A. Chronological Record

According to the *Chronological Record* (Ex. A), on 10-24-01 at 0700 hrs, Milla was arrested in his home. Milla's friend, Celendonio "Alex" Velarde was present when the arrest warrant was served. The detectives verified that Velarde had no warrants and was not on probation or parole. The detectives asked Velarde if he would voluntarily go to the Harbor Station to be interviewed, and Velarde agreed. (Ex. A, pgs. 21 - 22.)

At 0930 hrs. on October 24, 2001, Velarde was interviewed by the detectives. "Velarde denied all knowledge of the murder and being at or near the scene when it occurred. Velarde said he & Milla were at "Sandra's" apt when it occurred." (Underlined portion in original.) (Ex. A, pg. 22.)

At 1042 hrs. on the same day, the detectives interviewed Milla. "Milla denied all knowledge of the murder and being at or near the scene when it occurred. He said he was at his girlfriend 'Sandra's' apartment in Downey during the time of the murder." (Underlined portion in original.) (Ex. A, pg. 22.)

The next morning, on 10-25-01 at 1030 hrs., "Milla's girlfriend 'Sandra' (Sandra Jauregui, 9023 Hasty Av, Downey, cell ph# (562) 879-2246, CDL# B8789290) came to Harbor Station to visit Milla. Det. Vander Horck spoke to Jauregui & exchanged information & told her Dets wanted to interview her A.S.A.P. after that date." (Underlined portion in original.) (Ex. A, pg. 22.) No mention is made whether Det. Vander Horck asked Ms. Jauregui whether she could confirm the alibi given by both Milla and Velarde, or what was said between them.

The next event in the *Chronological Log* (Ex. A, pg. 23) is listed at 1400 hrs. on Oct. 25, 2001: "Dets presented the case to Asst. DDA Scott Carbaugh who filed (1) Ct 197(A) PC w/ special allegation for hate crime & (5) Cts 664/187(A) PC."

### B. Follow-up Investigation Report dated 10/25/01

The *Follow-up Investigation Report* (Ex. B) is a synopsis of the investigation of the case and contains information that, if complete, would reasonably be needed

1 by the filing deputy DA to make an informed decision whether to file a criminal
2 case. Det. Ulley now claims this report (Ex. B) was given to the filing DA at the
3 first meeting with the district attorney.[6]

This report (Ex. B) leaves out any information regarding Milla's alibi, and contains instead the following limited information about Milla's arrest:[7]

> *"Wednesday, October 24, 2001* [¶] At 0700 hours, Marco Milla was arrested at his residence without incident. Detectives searched his residence and seized numerous items as evidence. In addition, Celedonio Alejandro Velarde, who is a close associate of Milla (and a documented "Arta" gang member), was briefly detained as he was inside of the location with Milla when the warrant was served. Detectives verified Velarde had no warrants and was not on probation or parole. Detectives then asked Velarde if he would come to Harbor Station voluntarily to be interviewed and he agreed." (Italics in original.)

The *Follow-up Investigation Report* (Ex. B) misrepresents the interviews of both Velarde and Milla by omission by stating only the following:[8]

> "At 0930 hours, detectives interviewed Celedonio 'Alex' Velarde at Harbor Station. Detective Ulley informed him he was not under arrest and was free to leave at any time which Valarde said he understood. In sum, Velarde denied all knowledge of the murder and denied being at or near the scene when it occurred. [¶] At 1042 hours, detectives questioned Milla at Harbor Station. Prior to questioning, Detective Ulley advised Milla of his Miranda rights verbatim from LAPD Form 15.03 which he agreed to waive. In sum, Milla denied all knowledge of

---

[6] See Dkt. 58-2, *Declaration of Richard Ulley in Support of Defendants' Motion for Summary Judgment.* (*Id.* at 18.).

[7] See Ex. B, pg. 32.

[8] See Ex. B, pg. 32.

-4-

1 the murder and denied-being at or near the scene when it occurred."

**C.   The Detectives' Deposition Testimony**

Attached as Exhibit C is a true and correct copy of Detective John Vander Horck's deposition transcript on 11/10/16.[9] During his deposition, Det. Vander Horck claimed either limited or no recollection about the events in question.

However, Det. Vander Horck did testify to the following points:

- He is not certain what occurred at the filing meeting on October 25, 2001, but believes he was present at the meeting. (Ex. C, pgs. 43 - 44.)
- To the best of his recollection, he thinks he had a discussion with the filing deputy regarding a potential alibi for Milla, but he doesn't know what was said, and he doesn't know if any of the details of the alibi were discussed at that first meeting. (Ex. C, pgs. 58 - 59.) (See also Dkt. 64-2 at 5-6.)
- He does not remember discussing Milla's alibi with the filing district attorney or any district attorney at any time. (Ex. C, pg. 61.) (See also Dkt. 64-2 at 5-6.)
- He does not remember discussing with the filing deputy that Velarde lived approximately two blocks away from Sandra's house, and that Milla drove him home that night with no one else in Milla's truck. (Ex. C, pgs. 60-31.) (See also Dkt. 64-2 at 6-9.)
- The filing deputy was given a copy of the murder book at that meeting. (Ex. C, pg. 63.)
- He then said at the time of the initial presentation to the filing deputy, his
- "common practice" was to not make an entire copy of a "Murder Book" for a presentation. He would bring the book so the DA can read it. "That's always been our practice. [The DA] can look through it if he wants to, and we do a verbal presentation." They then take the Murder Book back and make copies, usually two; one for the DA, and one for the defense. (Ex. C, pg. 73.)
- He thought Sandra Jauregui was an "extremely important witness, and he

---

[9] Excerpts of Det. Vander Horck deposition transcript are found at Dkt. 64-2 and 75-2.

-5-

1       definitely wanted to interview her because of the alibi. (Ex. C, pg. 79.)

2 •  The entry in the Chronological Record (Ex. A) regarding Sandra Jauregui is
3     in his handwriting.[10] (Ex. C, pg. 85; Dkt. 64-3 at 14.)

4 •  When asked if page 23 of the "Chronological Record" (Ex. A, pg. 23) was
5     given to the district attorney at the filing meeting on 10/25/2001, he
6     answered, "I don't think so." (Ex. C, pg. 87.)

7 •  He didn't recall telling the district attorney that both Milla and Velarde
8     said they were at Sandra's house when the murder occurred. (Ex. C, pg. 87.)

9 •  Both Milla and Velarde were separated from the time the detectives met up
10    with them until the time they made their statements about being at Sandra's
11    house, (Ex. C, pg. 89.), and he had no evidence or belief that Milla and
12    Velarde discussed the case to come up with an alibi while in police custody.
13    (Ex. C, pgs. 91 - 92.) (See also Dkt. 64-2 at 14-15.)

14 •  That is both a matter of how he was trained and common sense. (Ex. C, pg.
15    91-92.) (See also Dkt. 64-2 at 14-15.)

16 •  He has no recollection of telling the filing DA what witness McCombs said
17    when shown Lineup "E." (Ex. C, pgs. 98-99.)

18 •  He believes he followed his practice of not taking a copy of the Murder Book
19    for the DA.  They went over whatever the DA wanted to go over, and then
20    took it back and later made a copy for the DA.  (Ex. C, pg. 105-106.)

21 •  At the time of the meeting with the district attorney's office, he believes that
22    he did not take with him the tape recordings of the witnesses' interviews for
23    the district attorney to listen to.) (Ex. C, pg. 107.)

24 •  He did not explain to the filing DA at the first meeting, or at any time, that a
25    witness named Krystal Delgado had not identified anyone on photo Lineup
26    "E." (Ex. C, pg. 115)

27 •  He does not remember ever telling the district attorney that a witness
28    mentioned that the suspect had a tattoo on or over the right eyebrow area.

---

[10] See. Ex. A, pg. 23.

1  (Ex. C, pg. 122.)
2  • He has no independent recollection of telling the district attorney that a
3     witness had told him that the suspect had a "dark mark on forehead over left
4     eye." (Ex. C, pgs. 123-124.)
5  • He has no recollection of discussing with the filing DA what was said when
6     witness Erica Hightower was shown Photo Lineup "E." (Ex. C, pgs. 134-
7     135.)
8  • When victim Remar Jenkins identified Milla in Lineup "E", there was no
9     recording of that interview produced. He claimed, as did Det. Ulley, that the
10    tape somehow failed. However, he does not remember if that information
11    about the failed tape was given to the filing DA or to any district attorney.
12    (Ex. C, pg. 149.)

In addition to the above instances, Det. Vander Horck gave no testimony in his deposition ("Ex. C) which demonstrated that the filing deputy exercised his independent discretion.[11]

Attached as Exhibit D is a true and correct copy of Detective Richard Ulley's deposition transcript on November 8, 2016.[12] Det. Ulley also often claimed limited recollection about the meeting with the filing district attorney. However, Det. Ulley did testify to the following points:

• When presenting this case to the district attorney, he provided a large amount of information from the Murder Book, but he can't say exactly what. (Ex. D, pg. 235.)
• Det. Ulley provided a briefing to the district attorney and told him he believed there was probable cause. (Ex. D, pg. 237.)
• At the conclusion of presenting the case, the filing district attorney decided

---

[11] See the following deposition page and line numbers in Ex. C: 14:18-16:4; 26:18-31;3; 32:2-34:6; 34:9-17; 44:11-47:20; 51:12-23; 55:9-12; 55:13-23; 57:6-9; 58:8-17; 60:12-23; 73:2-17; 75:4-9; 76:12-22; 77:19-78:9; 83:12-16; 90:7-25; 91:21-92:5; 98:16-99:19; 101:4-104:15; 103:16-104:15; 117:1-10; and 118:9-25.

[12] Excerpts of Det. Ulley deposition transcript are found at Dkt. 64-3 and 75-1.

-7-

|   |   |
|---|---|
| 1 | to file against Milla (Ex. D, pgs. 238 - 239.), and said that his decision to file |
| 2 | was based on the information provided at the meeting. (Ex. D, pg. 240.) |
| 3 | •    He is aware of no other information being presented to the filing district |
| 4 | attorney other than what he provided. (Ex. D, pg. 240.) |

When asked what was told to the filing district attorney at the filing meeting, Det. Ulley provided a lengthy statement (Ex. D, pgs. 240 - 246.), which included the following demonstrably untrue statement:

> "And after that arrest and when Mr. Milla was brought back to the station with I believe a male friend of his who was also there who voluntarily agreed to come to the station for interview, that I talked to Mr. Milla, advised him of his rights. He waived his rights and agreed to make a statement, and that Mr. Milla provided essentially an alibi statement and said that he was at his girlfriend, I believe Sandra's house I believe in the city of Downey when this incident occurred. So he provided an alibi statement. [¶] My partner and I then investigated that alibi statement. But because of a lack of cooperation due to I believe his girlfriend and another female named Erma, I believe was her name, we tried to set up appointments to interview them. They didn't honor those appointments. I door knocked their house. They were inside but still refused to meet with me and make any kind of a statement. So based upon the lack of cooperation we were unable to prove or disprove his alibi statement. [¶] So, these are things I discussed with the district attorney at the time of filing that I recall specifically as we're talking now." (Ex. D, pgs. 89-90) (See also Dkt. 64-3 at 10.)

This statement is clearly untrue and is contradicted by the Chronological Record (Ex. A.) which details all investigation up to the date of the filing meeting and afterwards. The so called investigation of the "alibi statement" described by

Detective Ulley was not initiated until November 5, 2001, a full 10 days after the filing meeting when the case was filed against Milla.

- He does not recall whether he ever told the filing deputy that Jenkins had been shown a photo of Milla in more than one photo lineup. (Ex. D. pg. 252) (See also Dkt. 64-3 at 11.)
- When asked if he gave the Chronological Log to the district attorney, he says, "I don't recall if I did that personally." (Ex. D, pg. 260.)
- Then, after saying that he seems to recall seeing the district attorney with the Chronological Log, he was asked if that was at the filing meeting or some other time, and he answered, "The chrono - - I don't recall if the chrono was provided - - as to the stage of completion that that chrono was completed at at (sic) of the time of filing." (Ex. D, pg. 261.)
- He does not know what the filing deputy read at the filing meeting. Ex. D, pg. 263.0 (See also Dkt. 64-3 at 15-16.)
- He does not remember telling the filing DA that victim Erica Hightower said that the shooter was 5'5" tall. (Ex. D, pgs. 287-288.)
- He does not recall discussing with the filing DA that Velarde and Milla did not have the opportunity to talk to each other from the time of their arrest until they were interviewed, and they both gave the same alibis. (Ex. D, pgs. 305-306.) (See also Dkt. 64-3 at 24-25.)
- He does not recall telling the filing district attorney that he had not interviewed the two corroborating alibi witnesses, but intended to interview them in the future. (Ex. D, pgs. 305-306.) (See also Dkt. 64-3 at 25-26.)
- He did not remember whether he had told the filing deputy at the filing meeting that he had not completed his alibi investigation. (Ex. D, pgs. 310.) (See also Dkt. 64-3 at 27.)

In addition to the above instances, Det. Ulley gave no testimony in his deposition (Ex. D) which demonstrated that the filing deputy exercised his

independent discretion.[13]

### D. Internal Review by District Attorney Involving Police Investigation

Perhaps the most significant evidence and conclusion is found in an internal review *Memorandum* prepared by Deputy-in-Charge Judith Pettigrew after the court granted Milla's *Habeas Corpus Petition*.[14]

This *Memorandum* reviews the entire case against Milla, including the police investigation and the trial. The most damaging information to the defendants is found in Dkt. 64-1 at 7-8, and at 21-24:

> "Det. Ulley, the investigating officer, initially testified at trial that when Jenkins was first shown card E, Jenkins immediately identified Milla and said he was certain Milla was the shooter. However, **when Det. Ulley's memory was refreshed by reading his partner officer's notes**, Det. Ulley recalled Jenkins first said the person in slot #2 **looks most like the shooter out of all the displayed photographs**."

(Emphasis added.) (*Id*. at 8.)

> "When shown photographic arrays of suspects, none of the testifying witnesses [at Milla's trial] positively identified Milla." (Dkt. 64-1 at 22.)

More specifically:

> "Only Ramar Jenkins unequivocally identified Milla's photo in the six pack but **the statement on the photo identification report is not quite accurate and is misleading**. The investigating officer's notes of the photo show up indicate that when Ramar Jenkins saw Milla's 6 pack he said. that **Milla looks most like the shooter out of all of them**. On an earlier occasion, Jenkins had seen a 16-pack containing

---

[13] See the following deposition page and line numbers in Ex. D: 80:11-25; 81:22-82:8; 83:15-22; 88:19-23; 89:1-7; 95:10-14; 95:23-101:8; 102:23-105:15; 106:25-108:6;132:4-133:2; 134:3-136:7; 137:18-138:10; 138:11-139:16; 143:13-145:7; 145:16-147:10; 150:3-152:11; 152:12-153:21; 155:4-17; 159:7-14; 163:8-164:3; and 169:25-172:25.

[14] This *Memorandum,* obtained by Milla's attorneys during discovery, is at Dkt. 64-1.

-10-

1  Milla's photograph and he had failed to identify him; in a 3rd 6-pack,
2  Jenkins indicated an individual who looked like the shooter."
3  (Emphasis added.) (*Id*. at 23.)
4  On January 6, 2017, after testifying repeatedly in his deposition (Ex. D) that
5 he could not remember specific matters, Det. Ulley signed a declaration prepared by
6 his attorneys in which he gave detailed information concerning the first meeting
7 with the district attorney. With reference to the above-reverenced meeting with
8 Ramar Jenkins, Det. Ulley swears:
9  "On October 22, 2001, Vander Horck and I showed Jenkins the
10  six-pack photo display with Plaintiff in the #2 position, photo display
11  "E" and read him the photographic admonition. We also tape recorded
12  the interview, however, after the interview was completed, I re-wound the
13  tape and discovered the quality of the tape recording was very poor and the
14  words people said were difficult to hear. Thus, we recreated his previous
15  identification process using a different tape and tape recorder. I asked Jenkins
16  to confirm his identification, read him the photographic admonition again,
17  asked him to confirm that I had previously read the admonition to him, and
18  Jenkins confirmed he positively identified Plaintiff as the shooter. Jenkins
19  wrote, "the guy on card "E," slot 2 is the shooter." (Dkt. 58-2, ¶ 35 at 14.)
20  This is the same interview in which witness Jenkins said, "Milla looks most
21  like the shooter out of all of them" (*Id*. at 23), and Det. Ulley changed his
22  testimony when his memory was refreshed by reading his partner officer's
23  notes. (*Id*. at 8.)
24  So, when Det. Ulley swears in his declaration that he told the filing deputy
25 district attorney, Scott Carbahal, that he had obtained a "positive identification by
26 Jenkins and the tentative identifications by McCombs and E. Hightower" (*Id*. ¶ 47
27 at 18), that was also false and misleading. Or, as Deputy-in-Charge Pettigrew put it,
28 it was "not quite accurate and is misleading." (Dkt. 64-1 at 23.)

It is anticipated that the defendants herein will rely on Ulley's declaration filed in support of their motion for summary judgment. However, the docket entries cited above along with the deposition testimony all demonstrate a failure to recall, which is specifically contradicted by his testimony in his declaration. Under such circumstances, the Ninth Circuit has held "[s]everal of our cases indicate that a district court may find a declaration to be a sham when it contains facts that the affiant previously testified he could not remember. "*Yeager v. Bowlin*, 693 F.3d 1076 (9th Cir. 2012). As such, this Court should disregard the declaration of Ulley in this case because he has not put forth any excuse as to how or why he now remembers.

Finally, it should also be noted that there is no evidence from the filing deputy district attorney, Scott Carbaugh, countering any of the above facts or otherwise claiming that he exercised his independent judgment in filing this case.

## 2. CONCLUSION

It is inescapably obvious that a reasonable prosecutor would want to know if a suspect's alibi is valid before charges are filed against that person if only because prosecutors are required to do so, especially, "[w]hen shown photographic arrays of suspects, none of the testifying witnesses [at Milla's trial] positively identified Milla" (Dkt. 64-1 at 22.). Further, as shown above, the information that the police provided to the prosecutor was ". . .not quite accurate and is misleading." (Dkt. 64-1 at 23.)[15]

Dated: April 14, 2020              Respectfully Submitted,

                                   **LAW OFFICES OF MARTIN STANLEY**

                                   /s Martin Stanley
                                   MARTIN STANLEY
                                   Attorneys for Plaintiff

---

[15] Finally, respectfully, the Court is cited to the objections to further proceedings on the summary judgment issues subsequent to reversal filed by plaintiff as Dkt. numbers 183 and 185.

# PROOF OF SERVICE

I, EDMONT T. BARRETT, declare as follows:

I am over the age of 18 years, and not a party to this action. My business address is 5150 East Pacific Coast Highway, Long Beach, California 90804, which is located in the county where the mailing described below took place.

On April 14, 2020, I served the foregoing document(s) described as:

**PLAINTIFF'S BRIEF ON THE ISSUE OF THE PROSECUTOR'S INDEPENDENT JUDGMENT** on all interested parties in this action:

**Attorney for Defendants:**
MATTHEW W. McALEER, Deputy City Attorney
200 N Main Street, City Hall East, 6th Floor
Los Angeles, CA 90012
matthew.mcaleer@lacity.org

I serve a true copy of the document(s) above:

[X] By United States mail. I enclosed the documents in a sealed envelope or package addressed to the person(s) at the address(es) mentioned above and:

[X] placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage full prepaid.

[X] I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

[X] I hereby certify under the penalty of perjury that the foregoing is true and correct.

Executed on April 14, 2020 at Long Beach, California.

                                          **/S/ Edmont T. Barrett**
                                          **EDMONT T. BARRETT,** Declarant