**LAW OFFICES OF MARTIN STANLEY**
Martin Louis Stanley [State Bar No. 102413]
100 Wilshire Blvd., Suite 700
Santa Monica, California 90401

**LAW OFFICES OF EDMONT T. BARRETT**
Edmont T. Barrett [State Bar No. 74117]
5150 East Pacific Coast Highway
Long Beach, CA 90804
Telephone: (562) 597-3070
Facsimile: (562) 494-1132

Attorneys for *Plaintiff*, MARCO MILLA

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCO MILLA an individual,<br><br>        Plaintiff,<br><br>    vs.<br><br>CITY OF LOS ANGELES a municipal entity; LOS ANGELES POLICE DEPARTMENT, a municipal entity; COUNTY OF LOS ANGELES, DETECTIVE R. ULLEY AND DETECTIVE J. VANDER HORCK, and DOES 1 through 100, inclusive,<br><br>        Defendants. | Case No. 2:16-cv-00134-SVW-MRW<br>Hon. Stephen V. Wilson, Judge Presiding<br><br>**DECLARATION OF MARTIN STANLEY IN SUPPORT OF PLAINTIFF MARCO MILLA'S APPLICATION FOR WRIT OF HABEAS CORPUS AD TESTIFICANDUM AND/OR FOR AN ORDER THAT THE VIDEO TAPED DEPOSITION MAY BE USED IN PLACE OF PERSONAL APPEARANCE**<br><br>**Application Date: May 16, 2022**<br>**Time: 1:30 PM**<br>**Courtroom: 10A**<br><br>**<u>Trial</u>**<br>**Date:      June 14, 2022**<br>**Time:      9:00 A.M.**<br>**Courtroom: 10A** |

**Pre-Trial Conference**
**Date:        May 23, 2022**
**Time:        3:00 P.M.**
**Courtroom: 10A**

I, MARTIN STANLEY, declare:

1. I am an attorney duly licensed to practice law in this Court, attorney of record for Plaintiff MARCO MILLA. The facts herein are of my own personal knowledge, and if sworn I could and would competently testify thereto.

2. I submit this Declaration in support of Plaintiff MILLA's Application for Writ of Habeas Corpus Ad Testificandum for Ramar Jenkins and/or for an order permitting the playing or reading of either parts or the entirety of his one hour video taped deposition. Ramar Jenkins is incarcerated in prison. Pursuant to 28 U.S. Code § 2241, Mr. Jenkins is a necessary witness for the trial in the above-referenced matter in that he was the only one who allegedly positively identified plaintiff Milla at the original criminal trial over 20 years ago.

3. Ramar Jenkins deposition was taken after (a) obtaining available dates from defense counsel (see attached as Exhibit 1 a true and correct copy of emails documenting the available dates for defense), (b) moving ex parte to the Magistrate to issue an order, which order was issued with no objection whatsoever being filed by defense (See, Docket Document entry 230).

**DECLARATION OF MARTIN STANLEY ISO PLAINTIFF'S WRIT OF HABEAS CORPUS AD TESTIFICANDUM, ETC.**

4. Plaintiff met and conferred after the deposition with defense counsel, who indicated at the end of the deposition transcript (perhaps because the testimony did not go his client's way) that he was going to object to the playing and/or reading of the deposition transcript. Attached as Exhibit 2 are true and correct copies of the emails documenting the meet and confer process re playing and/or reading the deposition of Mr. Jenkins.

5. Mr. Plowden, defense counsel, was fully able to participate in the deposition and asked all the questions he wanted to ask. (A true and correct copy of the rough draft of the deposition transcript is attached as Exhibit 3 as the original has not yet been fully transcribed). Mr. Plowden was able to attend the deposition in person if he so chose to attend as he had obtained clearance from the prison prior to the time of the deposition being held. Basically, at the conclusion of the deposition, he had "buyer's remorse" and in fact wrongfully attempted to accuse plaintiff's counsel of wrongdoing as per the emails.

6. In fact, the day before the deposition I advised Mr. Plowden during our phone conversation that I was flying down on the early morning flight to El Centro and told him I would be happy to see him- in response to his comment that it was a difficult drive to get there.

7. Ramar Jenkins is and will be a prisoner at the time of trial of this matter. It is my understanding that Calipatria State Prison near El Centro, California, where Mr.

**DECLARATION OF MARTIN STANLEY ISO PLAINTIFF'S WRIT OF HABEAS CORPUS AD TESTIFICANDUM, ETC.**

Jenkins is a prisoner, is more than 100 miles away from the Courthouse

(approximately 191) and as such it appears there is no lawful objection that

defendants can file to prevent the use of the deposition testimony.

8. During the deposition, Mr. Jenkins expressed his strong preference to not have to

appear in person. However, I explained to him that was up to the Court to decide.

I declare under penalty of perjury under the laws of the State of California that the

foregoing is true and correct and that this declaration was executed on April 11, 2022, at

Santa Monica, California.

By:  */s/* MARTIN STANLEY
_____
          Martin Stanley
          Attorney for *Plaintiff*,
          MARCO MILLA

# EXHIBIT 1



---

**Are you okay stipulating to moving up the PTC in Milla**
1 message

---

From: **Geoff Plowden** <geoffrey.plowden@lacity.org>
Date: Mon, Mar 28, 2022 at 9:02 AM
Subject: Re: Are you okay stipulating to moving up the PTC in Milla
To: Martin Stanley <mstanleyesq@gmail.com>
Cc: Edmont T. Barrett <etb@barrettlaw.us>


4/5 and 4/6

On Fri, Mar 25, 2022 at 9:03 PM Martin Stanley <mstanleyesq@gmail.com> wrote:

> hi. hope all is well. we are going to depose ramar jenkins, who is currently in calapatria state prison. what day are you available the week of april 4? thanks
>
> martin stanley

# EXHIBIT 2

 Gmail

## Meet and confer
1 message

---------- Forwarded message ---------
From: **Martin Stanley** <mstanleyesq@gmail.com>
Date: Thu, Apr 7, 2022 at 3:02 PM
Subject: Re: Meet and confer
To: Geoff Plowden <geoffrey.plowden@lacity.org>
Cc: Edmont Barrett <etb@barrettlaw.us>, Chris O'Shea <coshea@trialtechnologies.net>, steven halteman <crsteve333@yahoo.com>

further, i have an impeccable reputation, have been called on by the commission on judicial performance to intervene with judges with alcohol issues, was appointed to the state of california's diversion committee for the dental board, and have been a probation monitor for the state bar, as well as thousands of hours of other volunteer service commitments so for you to MAKE UP some attempted false accusations is really out of line.

On Thu, Apr 7, 2022 at 2:58 PM Martin Stanley <mstanleyesq@gmail.com> wrote:
> well that's really out of line to make a comment like that in your email.  as you know, all meetings were within ear range of guards and you have no right to attempt to make any false allegations like this.  and you may be just upset cause you dont want to hear the truth of what actually happened.
>
> On Thu, Apr 7, 2022 at 2:39 PM Geoff Plowden <geoffrey.plowden@lacity.org> wrote:
>> His testimony was patently false, not clear and makes complete sense that it came only after you had a twenty minute meeting with him.
>> My initial take is that he has to testify in person as he must be impeached with exhibits, and I objected and reserved my right to object to the use of the depo in lieu of live testimony. I will agree we have met and conferred on any motion to have him brought to court.
>>
>> On Thu, Apr 7, 2022 at 1:15 PM Martin Stanley <mstanleyesq@gmail.com> wrote:
>>> Nice chatting w u today. Please let me know your final position on jenkins depo. Depending on your response I will be asking the court to either bring him down in person or play his depo. Either way his testimony was clear, honest and makes complete sense given the circumstances that happened at that 6 pack meeting.  Just let me know your position. Thx Martin
>>>
>>> Sent from my iPhone

# EXHIBIT 3

```
00:00   1
        2                         DISCLAIMER
        3
        4    CCP Section 2025 (r) states:  "When prepared as a
             rough draft transcript, the transcript of the
00:00   5    deposition may not be certified and may not be used,
             cited, or transcribed as the certified transcript of
        6    the deposition proceedings.  The rough draft
             transcript may not be cited or used in any way or at
        7    any time to rebut or contradict the certified
             transcript of the deposition proceedings as provided
        8    by  the deposition officer."
        9
00:00  10
       11    THIS IS AN UNCERTIFIED REALTIME DRAFT THAT HAS BEEN
       12    PREPARED IN ROUGH EDIT FORM AT COUNSEL'S REQUEST AND
       13    FOR COUNSEL'S CONVENIENCE.  NO REPRESENTATION IS MADE
       14    ABOUT ITS ACCURACY.
00:00  15
       16             CASE NAME: Milla vs. City of Los Angeles
       17             DEPONENT:  Ramar Jenkins
       18             DATE TAKEN:  April 6, 2022
       19
00:00  20                        EXAMINATION
       21    BY MR. BARRETT:
       22        Q    Good afternoon, sir.  Could you please state
       23    and spell your name for the record?
       24        A    Ramar Jennings, R-a-m-a-r, J-e-n-k-i-n-s.
12:00  25        Q    Thank you.
```

                                                                       1

12:00    1            And have you ever had your deposition taken

         2    before?

         3       A     Never been in a deposition.

         4       Q     Okay.

12:00    5       A     Oh, well, actually, explain a little bit more

         6    what's going on.

         7       Q     And I'm going to do that right now, so I want

         8    to tell you about the rules of the deposition, and

         9    then you'll have a chance if you have any questions to

12:00   10    ask me.

       11            One thing for sure is we have to talk loud

       12    enough so that the nice lady that's typing can type

       13    every word that's stated.

       14            Does that work?

12:01   15       A     Okay.

       16       Q     And number two, we should try to speak slowly

       17    so we don't speak over one another, so again, the nice

       18    lady can make sure to get everything typed into a

       19    little booklet.  Okay?  Yes?

12:01   20       A     All right.  Yes.

       21       Q     Okay.  And so what we're going to be doing

       22    here, it's basically a question-and-answer session

       23    about some events that happened quite a while ago.

       24    We're going to try to get your recollection of those

12:01   25    events.  If you have a recollection, that's great.  If

12:01   1   you don't have a recollection, it's perfectly fine to

2   say, "I don't recall."  Okay?

3       A    Okay.

4       Q    Now, if you do have some kind of a

12:01   5   recollection, like an estimate, for example, we're

6   entitled to that.  We don't want you to guess at

7   anything.  Okay?

8       A    All right.

9       Q    As you know, this case involves Marco Milla

12:01   10  versus the City of Los Angeles, and you were a witness

11  way back when to that -- in that particular case.

12  We're going to be asking you some questions about

13  that, basically, today.

14          Fair enough?

12:01   15      A    Okay.

16      Q    And so let me explain to you the difference

17  between an estimate and a guess just so you know what

18  kind of information we're looking for.

19          If I were to ask you the length of this

12:02   20  table, you probably would estimate, I don't know, it's

21  about five feet?

22      A    Right.

23      Q    If I were to ask you the length of the table

24  in my house, since you haven't been there, that would

12:02   25  be a guess.

12:02   1          A    Right.  Right.

        2          Q    So take your time.  Breathe, because that way

        3     we can make sure that we answer before we -- before we

        4     get on top of each other.  It's kind of like a script.

12:02   5     We don't want to talk on each other's lines, you know,

        6     in Hollywood, and make sure everything goes on the

        7     record for the nice lady to type.  Okay?

        8          A    All right.

        9          Q    And we also want to make sure -- I know that

12:02  10     you haven't taken any drugs or alcohol in the past

       11     24 hours that might affect or impair your testimony

       12     here today.  True?

       13          A    True.

       14          Q    And you haven't reviewed any documents in

12:02  15     preparation for your deposition, have you?

       16          A    True.

       17          Q    Now, your testimony, even though it's here at

       18     the prison, informally, without a judge, it has the

       19     same force and effect as if given in a court of law.

12:02  20               Do you understand that?

       21          A    Okay.

       22          Q    And so we want you to give your best

       23     testimony.  And again, if you don't recall or, you

       24     know, you need time to think about an answer, just

12:03  25     tell us.  We're happy to wait and give you a chance to

| | | |
|---|---|---|
| 12:03 | 1 | give us the full and complete story of what you think |
| | 2 | happened.  Okay? |
| | 3 | A    All right. |
| | 4 | Q    Does that sort of make sense so far? |
| 12:03 | 5 | A    Yeah, so far. |
| | 6 | Q    So we're going to ask you some background |
| | 7 | questions first. |
| | 8 | A    All right. |
| | 9 | Q    What is your date of birth? |
| 12:03 | 10 | A    2/24/84. |
| | 11 | Q    Okay.  And where were you born, just so we |
| | 12 | know? |
| | 13 | A    Inglewood, California.  Daniel Freedman |
| | 14 | Hospital. |
| 12:03 | 15 | Q    Okay.  I'm an L.A. kid, too. |
| | 16 | And so did you go to high school? |
| | 17 | A    Yeah. |
| | 18 | Q    And where did you go to high school? |
| | 19 | A    I went to Pasadena High School.  I also went |
| 12:03 | 20 | to Dorsey High School in Los Angeles. |
| | 21 | Q    And did you go to any college? |
| | 22 | A    No college. |
| | 23 | Q    All right.  Now, some time ago in the early |
| | 24 | 2000s, you were a witness in a case, the Marco Milla |
| 12:03 | 25 | case. |

12:03   1           Do you recall that?

        2       A   I do.

        3       Q   Now, I'm going to ask you today about some

        4   conversations you had with the police officers that

12:04   5   were investigating the case.  Okay?

        6       A   Before you do, can I ask a -- I just have a

        7   couple questions.

        8       Q   Sure.  I'll do my best to answer.

        9       A   Does this -- like, is this going to affect me

12:04  10   going to court anytime away, because I really don't

       11   want to go to court no more.  It's like --

       12       Q   It has no effect one way or another.  That's

       13   up to the judge to decide whether you have to go or

       14   not.  But I'm not going to say -- this deposition will

12:04  15   not matter one way or the other.

       16       A   Yeah, I don't know.  It's not going to hurt

       17   me legally or nothing?

       18       Q   It cannot hurt you legally at all.  If anyone

       19   uses this deposition for any way against you, that

12:04  20   would be illegal to do.

       21       A   Okay.

       22       Q   Okay?  Any other questions?

       23       A   Yeah, that's pretty much it.  All right.

       24       Q   And I understand your concerns.  I don't want

12:05  25   to put you in any bind.  I'm just trying to get

6

| | | |
|---|---|---|
| 12:05 | 1 | information for the case so we can see what the truth |
| | 2 | of the case is. |
| | 3 | Fair enough? |
| | 4 | A   All right. |
| 12:05 | 5 | Q   Okay.  Now, you are here in prison, so let me |
| | 6 | ask you about that. |
| | 7 | Have you been convicted of a felony, just so |
| | 8 | all we know?  Sorry to -- |
| | 9 | A   Yeah. |
| 12:05 | 10 | Q   -- have to ask, but I have to ask. |
| | 11 | A   Yes. |
| | 12 | Q   And could you tell us what the conviction was |
| | 13 | for? |
| | 14 | A   For robbery, forgery. |
| 12:05 | 15 | Q   Okay.  And do you know approximately when |
| | 16 | that happened that you were arrested or convicted, |
| | 17 | just so we -- |
| | 18 | A   I was arrested 2015.  I took a deal 2016. |
| | 19 | Q   Okay.  Now, what I'd like to do is I'd like |
| 12:05 | 20 | to kind of take you back now to the events so we can |
| | 21 | get done, hopefully, in a rather efficient time and |
| | 22 | see if we can talk about your meet with the |
| | 23 | investigating officers either by phone or in person |
| | 24 | about the Marco Milla case.  Okay? |
| 12:06 | 25 | A   All right. |

12:06  1      Q    All right.  So from what I've seen, it

2   appears there were at least two meetings with them.

3           Does that make sense, or were there more?

4      A    The detectives?

12:06  5      Q    Yes.

6      A    Probably about two.  If I can recall, about

7   two meetings.

8      Q    Two meetings.  In person?

9      A    Yeah.

12:06  10      Q    And were there also telephone calls?

11      A    Yes, telephone.  I can't remember how many,

12   but...

13      Q    Were there several?

14      A    Yeah.

12:06  15      Q    More than three?

16      A    I estimate.

17      Q    Estimate three?

18      A    Yeah, about three.  Maybe more.

19      Q    Three or more.

12:06  20           Now -- so my understanding was -- and correct

21   me if I'm wrong -- is that one time they showed you a

22   bunch of photos, and then another time they showed you

23   a six-pack of photos.

24           Does that sort of refresh your recollection?

12:07  25      A    Yeah.

8

12:07  1       Q    Okay.  So let's get right to it.

       2            When they showed you the bunch of photos, do

       3       you recall if you were able to identify anyone?

       4       A    Not the bunch, no.  No, I can't really

12:07  5       recall.  No.

       6       Q    Okay.  Now, when they showed you the six-pack

       7       of photos, the six photos on a page, was that at a

       8       later time?

       9       A    Yeah, I think so.

12:07  10      Q    Okay.  And was the first time they showed you

       11      the big bunch of photos when you were in the hospital,

       12      if you recall?

       13      A    I don't think I was in the hospital.  I can't

       14      really recall.  I really can't.

12:07  15      Q    Okay.

       16      A    I remember they came to see me in the

       17      hospital, but I really don't recall.  I remember

       18      seeing a bunch of photos, though.  I think it could

       19      have been in the hospital, but I really can't recall.

12:07  20      Q    Fair enough.

       21      A    I really can't.

       22      Q    Do you recall any of the conversations when

       23      they showed you the bunch of photos?

       24      A    I don't remember the conversations at all.

12:08  25      Q    Okay.  The second time when they came and

12:08    1    showed you the six-pack --

         2         A    Yeah.

         3         Q    -- do you recall any details about what

         4    happened during that time?

12:08    5         A    I remember that one.  That was more -- I

         6    remember that being -- that was -- actually, I was

         7    living in Ontario.  They were kind of -- they were

         8    kind of pressing me a little bit, kept calling and

         9    calling and pressing.

12:08   10              So I remember that.  I remember when they

        11    called me on that one.

        12         Q    Okay.

        13         A    That's the six-pack.  They were a little bit

        14    more kind of like -- a little bit more pressed me

12:08   15    about the six-pack than a bunch of photos.

        16         Q    And when you say --

        17         A    That's only because I gave them a description

        18    of what I thought -- you know, what I -- you know,

        19    what I seen.  So I guess they came back with the

12:08   20    six-pack, and that's when they came to see me in

        21    Ontario at the time.

        22         Q    Okay.  So when you say they were pressing,

        23    what kind of pressing was going on?

        24         A    Just more like -- just -- just hounding me,

12:09   25    hounding me a little bit more.  Calling, and kept

12:09   1   calling.  I kept avoiding.  They kept calling.

2        Q    And when they came to see you, you actually

3   had a meeting.  Was it in Ontario?

4        A    Yeah.

12:09   5        Q    And what happened at the meeting?

6        A    I just remember -- if I can recall -- it's a

7   long time ago, but it was an older -- an older

8   gentleman, older detective and a young detective.

9   They were telling me, like, make sure to look at

12:09   10  certain scars and kind of kept like -- you know,

11  like -- at the time, they kind of like kept putting

12  their finger towards a picture that I kind of like --

13  you know, like had the little same description on what

14  I -- you know, because I was 50-50 on that.  I was

12:10   15  kind of 50-50 on it.  They kept kind of like just

16  every time he kept like putting his finger towards

17  this one picture telling me that, "You don't see

18  nothing," kind of like, "Do you remember this?" and

19  I'm kind of like -- as I'm looking at the picture, I'm

12:10   20  like, thinking to myself, it could have been.  It's

21  like 50-50.  I told them at the time it could be

22  50-50.

23       Q    And then what did he say?

24       A    I can't recall.  It was like what was said or

12:10   25  what was done.  But I just remember, like, to myself

11

| 12:10 | 1 | he just told me that out of all these pictures which |
| | 2 | one -- like, which one looks like the most likely to |
| | 3 | be the shooter, and I pointed to that one picture. |
| | 4 | Q   Prior to the time of you pointing, is it your |
| 12:10 | 5 | testimony that he pointed at that one picture -- |
| | 6 | A   He kind of like -- yeah, he kind of like |
| | 7 | pointed in a way, like -- I think it was recorded at |
| | 8 | the time.  He kind of pointed a little. |
| | 9 | I was young at the time.  I was 17 at the |
| 12:11 | 10 | time, so I was just -- I was just tired of him kept |
| | 11 | calling me and harassing me.  I just wanted to, like, |
| | 12 | get -- I was 50-50.  I didn't know if it was him or |
| | 13 | not.  I was 50-50.  But so, kind of just like that was |
| | 14 | him just to get him out the house, whatever.  Get him |
| 12:11 | 15 | away. |
| | 16 | Q   Who were you living with at the time? |
| | 17 | A   I was living with one of -- at the time, who |
| | 18 | was there with me was my mom's boyfriend.  He's |
| | 19 | deceased now, though. |
| 12:11 | 20 | Q   So in the room when this happened, it was the |
| | 21 | elder detective and the younger detective and you? |
| | 22 | A   Yeah, that's what's crazy.  I was 17 at the |
| | 23 | time.  I never -- I was kind of like by myself.  I |
| | 24 | didn't understand.  I was kind of like by myself at |
| 12:11 | 25 | the time, seventeen. |

12:11   1        Q    And did they tell you anything else like,

        2    "Oh, you know, he shot your friend," or anything like

        3    that --

        4              (Simultaneous speakers.)

12:12   5              (Reporter admonishment.)

        6              MR. PLOWDEN:  Objection.  Leading.

        7              THE WITNESS:  You want me to answer that?

        8    BY MR. BARRETT:

        9        Q    You can answer.

12:12   10       A    I just remember something to the effect of --

        11   he was telling me that they have -- that gang has a

        12   history of killing blacks.  They had killed a young

        13   girl.  Prior to that, a young boy at a liquor store.

        14   And kind of like just -- they don't like blacks.

12:12   15   They're like -- they're known for killing blacks,

        16   period.

        17              That kind of influenced me a little bit at

        18   the time being 17.  And it was only like a week after

        19   I got shot, so I was kind of like influenced by that.

12:13   20       Q    Okay.  So did that -- did them telling you

        21   that this gang has a history of killing blacks and the

        22   little girl and the little boy affect your

        23   identification?

        24       A    I think at that time, yeah.

12:13   25       Q    And why is that?

12:13    1        A    I mean, I just felt like that's what -- if

         2    that's what they do, you know, like, they pretty much

         3    like the KKK.  They don't -- like, don't quote me on

         4    this, they don't like blacks.

12:13    5        Q    So did that make you angry so that you were

         6    more inclined to pick someone?

         7             MR. PLOWDEN:  Objection.  Leading.

         8    BY MR. BARRETT:

         9        Q    Well, let me ask you, how did it make you

12:13   10    feel, just so we can --

        11             MR. PLOWDEN:  Objection.  Leading.

        12    BY MR. BARRETT:

        13        Q    You can answer how did it make you feel.

        14        A    At that time, if I can recall, probably made

12:14   15    me feel a little bitter.  A little bad.

        16        Q    And did that influence your decision making

        17    at all on that day?

        18        A    Yeah, a little bit.  Yeah.

        19        Q    How so?

12:14   20             MR. PLOWDEN:  Objection.  Vague as to which

        21    day.

        22    BY MR. BARRETT:

        23        Q    On the second day -- we're talking about the

        24    six-pack day just so we're clear, right?

12:14   25             MR. PLOWDEN:  Objection.  Lacks foundation.

                                                              14

| | | |
|---|---|---|
| 12:14 | 1 | Misstates his prior testimony. |
| | 2 | BY MR. BARRETT: |
| | 3 |     Q    You can answer.  Was it the six-pack day? |
| | 4 |     A    The six-pack day, yeah. |
| 12:14 | 5 |     Q    And how did it influence you? |
| | 6 |     A    At that time, just made me a little mad. |
| | 7 | Made me mad. |
| | 8 |     Q    And did that influence your decision making |
| | 9 | on that day? |
| 12:14 | 10 |     A    Yeah. |
| | 11 |     Q    And how so? |
| | 12 |     A    I felt like -- at that time, I felt like if |
| | 13 | they didn't like blacks, well, fuck 'em. |
| | 14 |     Q    And did that influence your pointing out the |
| 12:14 | 15 | person you pointed out on that day? |
| | 16 |     A    A little bit, yeah.  A little bit, yeah. |
| | 17 |     Q    And did the -- the finger-pointing by the |
| | 18 | elder detective also influence your pointing out the |
| | 19 | person you pointed out on that day? |
| 12:15 | 20 |     A    Yeah. |
| | 21 |        MR. PLOWDEN:  Objection.  Lacks foundation. |
| | 22 | BY MR. BARRETT: |
| | 23 |     Q    And were you a hundred percent certain that |
| | 24 | this was the man when you pointed it out? |
| 12:15 | 25 |     A    No, I never -- I never -- I didn't, no. |

12:15    1      Q    How certain were you?

       2      A    About 50 percent.  50-50.

       3      Q    Okay.  At any time either before or after

       4   that time up until today's date, did your thoughts

12:15    5   about it being 50-50, him or not him, ever change?

       6      A    More or less?

       7      Q    Either way.

       8      A    No, I just always looked at it as 50-50.

       9   Until they -- when they said convicted him, I figured

12:15   10   well, if they convicted him, if the police did what

     11   they supposed to do, that was how they felt.  They

     12   seen something that was right (inaudible).  As far as

     13   me, I was just 50-50.

     14      Q    You were never anything more than 50-50 on

12:16   15   this gentleman.

     16         Is that true?

     17      A    Right.  And I -- I never -- it was crazy

     18   because I never told the police I seen him.  I told a

     19   mutual friend what happened.  They must have got --

12:16   20   went to the -- I don't know what happened, but

     21   somehow, the police found out that I -- you know, I

     22   was a witness.  Because when they first came around, I

     23   told them I didn't see nothing.  I wasn't -- I told a

     24   mutual friend, which was a friend of the family, and I

12:16   25   guess they went to the detectives.  And I never

12:16   1   really -- you know, when they came to see me, I never,

2   never told them nothing about -- I don't know how they

3   figured out I was in Ontario, none of that.  They was

4   just popping up.  I don't know.

12:16   5       Q    Now, when they came to see on that second

6   time, when they showed you the six-pack, do you recall

7   them reading any kind of what they call an admonition

8   to you that goes something like this.  And I'll read

9   it, and then you'll tell me if you ever heard this on

12:17   10   the day of the event.  Okay?

11           "In a moment, I'm going to show you" -- it's

12   a paragraph, so give me a minute to read.  Okay?  It

13   goes like this:

14           "In a moment, I'm going to show you a group

12:17   15   of photographs.  The group of photographs may or may

16   not contain a picture of the person who committed the

17   crime now being investigated.  Keep in mind that

18   hairstyles, beards and mustaches may be easily

19   changed.  Also, photographs may not always depict the

12:17   20   true complexion of the person.  It may be lighter or

21   darker than shown in the photo.  Pay no an attention

22   to any markings or numbers that may appear on the

23   photos or any other differences in the type or style

24   of the photographs.  When you have looked at all the

12:17   25   photos, tell me whether or not you see the person who

12:17   1   committed the crime.  Do not tell other witnesses that

2   you have or have not identified anyone."

3          So do you recall either of the detectives

4   ever telling you that on the day that you met with

12:18   5   them about the six-pack?

6   A    I think so.  I think so.  I'm not really

7   sure.  I don't remember.

8   Q    Fair enough.

9          Now, I want to show you --

12:18  10          MR. STANLEY:  I think I'm going to show him

11   just this.  Just a second.  Can I have just a second?

12          MR. BARRETT:  Yeah.  Yeah.

13          Okay.  So now I'm going to show you -- well,

14   let me ask it first before I show you.

12:18  15          I'm going to probably show him 5341.  So if

16   Goldie can get that exhibit ready to go and I'll have

17   a few more questions.  This is going to be a copy of

18   the six-pack.  I'm going to show it to you in a few

19   minutes.  Okay?

12:19  20   BY MR. BARRETT:

21   Q    So about how long did that meeting last, if

22   you recall?

23   A    I don't know.

24   Q    Was it more than 20 minutes?

12:19  25   A    Probably about 30 minutes, 40.  I can't

                                                                18

12:19    1    recall.

         2        Q    Thirty to 40 minutes is your best estimate?

         3        A    Yeah.

         4        Q    And do you recall --

12:19    5             MR. PLOWDEN:  Objection.  Counsel, objection.

         6    He just said he can't recall.  Now you just put 30 to

         7    40 minutes in his mouth.  You're leading.  It lacks

         8    foundation.  I object to the form of the question.

         9    Let the witness testify, please, instead of testifying

12:19   10    on his behalf.

        11             MR. BARRETT:  Thank you, but you're not the

        12    judge.  He said 30 to 40 before I did, so I was just

        13    asking him if that was correct.  That's on the

        14    transcript.

12:19   15    BY MR. BARRETT:

        16        Q    So let me ask you.  Okay?  Do you have an

        17    estimate as to how long the meeting lasted?

        18        A    Like I say, about 30 or 40 minutes.  I'm

        19    estimating on that.

12:19   20        Q    Okay.  And do you recall, other than the

        21    couple -- the things that you've already stated that

        22    happened during that meeting, do you recall anything

        23    else that took place during that meeting or that was

        24    said?

12:20   25        A    I can't remember.

                                                                      19

12:20    1        Q    Okay.  Did you feel pressured the whole time?

         2             MR. PLOWDEN:  Objection.  Leading.  Misstates

         3    his testimony.  Lacks foundation.  No cause for that,

         4    Counsel.

12:20    5    BY MR. BARRETT:

         6        Q    You can answer.

         7        A    Yeah, I felt pressured from day one, from the

         8    time they was -- however they got in contact with me,

         9    that's when I felt pressured.

12:20   10        Q    Okay.

        11        A    At that time, I was 17.  I just got shot,

        12    just lost a good friend.  I was kind of in shock.  So

        13    I was kind of still -- and I have to mention that I

        14    was -- I was on medication from my gunshot wound.  I

12:20   15    was like -- I was out of it.  So I was on Tylenol and

        16    Codeine, all type of painkillers.  So I don't -- like

        17    I said, I don't know.  I don't -- I feel pressured,

        18    yeah.  I was just trying to get them out the house at

        19    the time.

12:20   20        Q    And how did you feel pressure?  To do what?

        21        A    I just felt pressured on just the whole -- I

        22    just felt pressured on just the whole ordeal, you

        23    know, basically to point somebody out.

        24        Q    And so I want to ask you -- I'm going to show

12:21   25    you a picture now, and you'll tell me if you recall,

| | | |
|---|---|---|
| 12:21 | 1 | because it's been quite a while, which one it was that |
| | 2 | you said the detective was pointing to before you |
| | 3 | pointed to him.  Okay? |
| | 4 | MR. BARRETT:  So can we pull up -- I want to |
| 12:21 | 5 | make sure this is the right one.  Just give me a |
| | 6 | second. |
| | 7 | BY MR. BARRETT: |
| | 8 | Q    And if you don't recall because it's been a |
| | 9 | while, you'll tell us that you don't recall, but we're |
| 12:21 | 10 | going to try to see if you can tell us which one it |
| | 11 | was that the detective was pointing you to. |
| | 12 | MR. BARRETT:  One more.  No, not that one. |
| | 13 | Hold on.  Yes.  Let me just show the court reporter |
| | 14 | and everyone.  I won't show the witness this |
| 12:22 | 15 | particular photo just to make sure we get the right |
| | 16 | one, put those other ones away, and you can tell me if |
| | 17 | that's the one we want to look at. |
| | 18 | Thank you.  Okay.  Great.  Because we don't |
| | 19 | have a screen here. |
| 12:22 | 20 | BY MR. BARRETT: |
| | 21 | Q    So why don't you tell us -- do you remember |
| | 22 | the question or do you want me to restate the |
| | 23 | question? |
| | 24 | A    You can restate it. |
| 12:22 | 25 | MR. BARRETT:  Would the court reporter be |

12:22   1   kind enough to read it back?

        2              (The record was read as follows:

        3              "Q    And so I want to ask you -- I'm going

        4              to show you a picture now, and you'll tell

12:22   5              me if you recall, because it's been quite a

        6              while, which one it was that you said the

        7              detective was pointing to before you

        8              pointed to him.  Okay?")

        9              THE WITNESS:  I kind of, like, don't feel

12:23  10   comfortable looking at that at these pictures

       11   personally.  It just brings up too much --

       12   BY MR. BARRETT:

       13       Q    Bad memories.

       14       A    Yeah.  It's bad.  So I can't answer.  But if

12:23  15   I give an estimate --

       16       Q    No, we don't want you to do that.

       17       A    Yeah, I don't even -- it's just too much.

       18              MR. BARRETT:  Okay.  So take it down.  I'm

       19   going to ask him a different question.  Okay.

12:23  20   BY MR. BARRETT:

       21       Q    Now, let me ask you, did you point to the

       22   same one that the officer or the detective pointed to

       23   before you did?

       24              MR. PLOWDEN:  Objection.  Leading.  Misstates

12:23  25   his testimony.

12:23   1                 MR. BARRETT:  Well, it doesn't.

        2                 But you can answer.

        3                 THE WITNESS:  I just -- I just -- if I can

        4       recall, I just remember whatever one he kept kind of

12:23   5       like pointing to, that's where I pointed to.  I don't

        6       remember which one it was.  I didn't even like looking

        7       at the faces like I don't like looking at them now.

        8       So I was just like -- that's all I can remember.

        9                 MR. BARRETT:  Okay.  Thank you.  I'm not

12:23  10       going to ask you any more questions.  He'll have some

       11       questions to ask.  Okay?

       12

       13                         EXAMINATION

       14       BY MR. PLOWDEN:

12:24  15          Q    Mr. Jenkins, where's this coming from?

       16                 MR. BARRETT:  Objection.  Argumentative.

       17                 MR. PLOWDEN:  That's fine.

       18       BY MR. PLOWDEN:

       19          Q    Talk to me, sir.

12:24  20                 MR. BARRETT:  There's no question pending.

       21       BY MR. PLOWDEN:

       22          Q    I'm asking where is this coming from?  If you

       23       don't understand, ask me to rephrase the question.

       24                 MR. PLOWDEN:  Counsel, keep your mouth quiet

12:24  25       except for objections, please.

                                                                    23

| | | |
|---|---|---|
| 12:24 | 1 | MR. BARRETT: Objection. Argumentative. |
| | 2 | MR. PLOWDEN: Okay. You've stated your |
| | 3 | objection. |
| | 4 | BY MR. BARRETT: |
| 12:24 | 5 | Q    Mr. Jenkins, do you understand the question? |
| | 6 | A    Not really. I don't -- I don't -- what you |
| | 7 | mean where it's coming from? |
| | 8 | Q    Talk to me. When the officers were |
| | 9 | interviewing you on tape and taking notes at the time, |
| 12:24 | 10 | right? They were taking notes and recording you when |
| | 11 | they interviewed you? |
| | 12 | MR. BARRETT: I'm going to object. That |
| | 13 | misstates the evidence, and you know it, Counsel, |
| | 14 | because there were tapes and one's missing. |
| 12:24 | 15 | MR. PLOWDEN: Counsel, another speaking from |
| | 16 | you and I'll suspend the deposition and go in front of |
| | 17 | the magistrate and see whether this is even going to |
| | 18 | be usable. |
| | 19 | BY MR. PLOWDEN: |
| 12:25 | 20 | Q    Sir, do you recall the officers when they |
| | 21 | interviewed you on two occasions that they took notes |
| | 22 | and recorded those interviews on a tape? |
| | 23 | MR. BARRETT: I'm going to object. It |
| | 24 | misstates the evidence. |
| 12:25 | 25 | But you can answer as best you can. |

24

12:25  1           THE WITNESS:  I think the -- the thing with

       2    Ontario here, I think.  I remember them recording

       3    something, writing down notes.

       4    BY MR. PLOWDEN:

12:25  5       Q    Okay.  And in that recording, are you aware

       6    that there's nothing that you stated that you were

       7    50-50?

       8           MR. BARRETT:  I'm going to object.  Leading.

       9           THE WITNESS:  Like I said, I don't really --

12:25  10   I don't really recall.  I don't really recall what I

      11    was saying.  I was kind of like -- I was kind of out

      12    of it.  I don't recall.  I was 17 at the time.  I

      13    don't recall what I said at the time.

      14    BY MR. PLOWDEN:

12:25  15      Q    Okay.  And when you went to court -- do you

      16    remember going to court testifying?

      17      A    Yeah, I did.

      18      Q    Okay.  First you went to a preliminary

      19    hearing; is that correct?

12:26  20      A    Yeah.

      21      Q    Okay.  And then you went to a trial; is that

      22    correct?

      23      A    Yeah.

      24      Q    And in both cases, the accused attorney asked

12:26  25   you questions about the photographic six-pack that you

| | | |
|---|---|---|
| 12:26 | 1 | viewed and how you made the selection. |
| | 2 | Do you recall that? |
| | 3 | A    Yeah, I remember. |
| | 4 | Q    And at no time during the preliminary hearing |
| 12:26 | 5 | or the trial did you ever say that the detectives |
| | 6 | pointed to a particular person during the six-pack |
| | 7 | process? |
| | 8 | MR. PLOWDEN:  Objection.  Leading and |
| | 9 | compound. |
| 12:26 | 10 | BY MR. PLOWDEN: |
| | 11 | Q    Is that correct? |
| | 12 | A    Yeah, that's correct. |
| | 13 | MR. PLOWDEN:  And if we could pull up the |
| | 14 | photo ID by Jenkins for the witness.  That's my |
| 12:27 | 15 | exhibit. |
| | 16 | BY MR. PLOWDEN: |
| | 17 | Q    I'm going to show you your statement form. |
| | 18 | We don't have to look at any pictures, but just your |
| | 19 | statement form. |
| 12:27 | 20 | I'm unable to see the screen.  I don't know |
| | 21 | if you can see the screen. |
| | 22 | MR. BARRETT:  We can see it. |
| | 23 | MR. PLOWDEN:  We're looking for the -- I'm |
| | 24 | sorry.  I have a black screen.  Are we able to show me |
| 12:28 | 25 | what is being displayed to the deponent?  It's not |

12:28  1   coming up on my screen.

2         MR. BARRETT:  Well, let me just tell you, it

3   has a date and Ulley in the middle and it has some

4   writing on it -- on it, if you want to go with that.

12:28  5         MR. PLOWDEN:  Okay.  I see it.  I've got -- I

6   apologize I have a half screen here.

7   BY MR. PLOWDEN:

8      Q   Mr. Jenkins, this is the photo ID.  Is that

9   your signature there on the form?

12:28 10     A   Yep.

11     Q   Okay.  And the writing, "The guy on Card E,

12   Slot 2 is the shooter," is that your writing?

13     A   Yep.

14     Q   Okay.

12:28 15     A   Listen, you asked me a question earlier,

16   right?  Well, now if I can get in between what y'all

17   got going, this is what it is.

18         I had years and years of -- of sitting

19   back -- this is 20 years ago.  For 20 years, I always

12:29 20   had in my mind, like, man, you know what?  Especially

21   me growing up and seeing how corrupt some police are,

22   being in the system myself, I always felt bad about

23   that situation.  So I told you -- and that's just

24   truthfully from my heart.  I always did.

12:29 25         Now, being in the system and being in this --

12:29   1    the whole going to court myself and being a subject of

2    people -- you know, being in a situation where -- that

3    people can put people in jail, I always feel bad about

4    it, because I wasn't a hundred percent sure.  I was 17

12:29   5    at the time.

6          I mean, for me, I feel like that was a bad

7    decision on my part.  And that's something that --

8    that's the only reason why I'm here doing this right

9    now.  I'm in the state penitentiary.  I've been down

12:29  10    seven years, and I don't feel right saying that

11    something I did and putting somebody -- I could have

12    put somebody in the same position I'm in.

13          If I can help, it is what it is.  That's it.

14    I'm not about to -- I don't want to go down Memory

12:29  15    Lane too much.  It's bringing back bad memories.  At

16    the end of the day, I lost a good friend.  I got shot.

17    And I'm not feeling like certain questions from both

18    sides.  So I'm not about to be a pawn to y'all chest

19    game.  I'm just telling you -- I'm just telling you

12:30  20    what it was at the time, that it was -- it was -- now

21    that I've looked back on 38, it wasn't done correctly.

22    It wasn't done where it's supposed to be done right.

23    I was 17.  I wasn't supposed to be alone with no

24    detective.  I was a teenager, first of all.  And it

12:30  25    was just -- now that I'm older and I feel a little

12:30   1    coerced and I just feel pressure by the whole

        2    situation.

        3           So I don't want to see no more pictures.  I'm

        4    just telling you what it is.  So that's -- that's --

12:30   5    when you ask me where it's coming from, that's where

        6    it's coming from.  I've been sitting in this cell for

        7    the past five years because of a lot of things I

        8    didn't -- I know for a fact my detectives on my case

        9    didn't have right.  So I can only imagine how it can

12:30   10   feel, you know, for this guy.

        11          So that's the only reason why I'm doing it.

        12   I'm not doing it for no other reason.  I don't have

        13   to.  I have no reason.  I lost a good friend that

        14   night.  Whether he did it or not, I still lost a

12:31   15   friend.

        16          But I do think the system is very corrupt,

        17   and I do think that the detectives did -- didn't do

        18   what they was supposed to do.  And I -- I -- I made a

        19   mistake.  I feel like I made a mistake even making a

12:31   20   statement on it and everything else.  So that's where

        21   I'm going to leave it at.

        22   BY MR. PLOWDEN:

        23      Q    Okay.  Can I ask you a couple questions just

        24   to follow up on that?

12:31   25      A    Yeah.

                                                                    29

12:31   1      Q    When you were arrested and convicted, what

        2   agency, what police agency was investigating you?  Was

        3   it sheriffs or LAPD or some other agency?

        4      A    It was Pasadena.  It was PD.

12:31   5      Q    Pasadena?

        6      A    Arcadia, Pasadena, yep.

        7      Q    Okay.  And have you -- have you had any

        8   contact with the -- since the time you went to court,

        9   have you had any contact with anyone on Mr. Milla's

12:32  10   behalf, any attorneys or law clerks or investigators,

       11   anything like that?

       12      A    No.

       13      Q    Okay.  And since you've been in the joint,

       14   have you had any correspondence or conversations with

12:32  15   anyone on behalf of Mr. Milla?

       16      A    No.

       17      Q    Okay.

       18      A    This is the first time this situation has

       19   ever been brought up in 20 years.

12:32  20   BY MR. PLOWDEN:

       21      Q    And that you said when you were inside after

       22   some time because of what happened to you, you felt

       23   that the system didn't -- wasn't fair or something

       24   like that.

12:33  25           Did you ever tell anyone before today that

```
12:33    1    maybe you made a mistake in the identification?

         2         A    I haven't.

         3         Q    Okay.

         4         A    (Inaudible.)

12:33    5         Q    Sorry.  Go ahead.

         6         A    It's not something I don't bring up.  It's

         7    something I buried in my mind and in my soul a long

         8    time ago.  And I, quite frankly, don't like bringing

         9    it up.  But it is something I just had to get off my

12:33   10    chest.  So it was just -- that's the only reason why

        11    I'm here talking to y'all right now.  It's just

        12    something that I had to get off my chest.

        13         Like I said, I just felt like I have to get

        14    this off my chest because I just -- I just feel like

12:33   15    it's something I have to do.  Like I don't really know

        16    if he was the shooter or not, period.

        17         Q    Okay.

        18         A    I don't know if he was or not.  I'm 50-50 on

        19    the whole situation, but that's what I believe.  I

12:33   20    really don't know.  Being 38, I don't really know at

        21    that time.  And being the fact that it was a lot of

        22    racist stuff going on in 2001.  It was a Mexican, a

        23    black, a lot of things going on.  It was basically,

        24    like, you know what, at that time whether he was the

12:34   25    shooter or not, they don't like blacks anyways, so --
```

31

```
12:34    1    and that was my (inaudible) well, fuck 'em.  And
         2    that's not a good (inaudible).  That's not even
         3    something good to do because I wasn't really a street
         4    person at that time, but I ended up getting into more
12:34    5    of a street -- that really fucked my life up to the
         6    point where I got into the street gangs and got into
         7    gang banging after that because I lost my -- I
         8    couldn't go to school.  I got shot.  I couldn't play
         9    football, so I was depressed.  I started getting in
12:34   10    the streets.  And knowing in the streets what I did
        11    was not right.  It wasn't cool at all.  Not just on
        12    the street, it's just the whole part of the system
        13    wasn't cool.  The way the detective, the way -- that
        14    whole ordeal was not cool.  It wasn't cool.  So that's
12:34   15    the only reason why I'm here doing it.  It's not for
        16    nobody else.  I'm not getting nothing out of this, but
        17    my own satisfaction.  It's not bringing nobody back.
        18    I'm still going to be doing my time.  I have my
        19    release date's still going to be 2023, '25, whatever.
12:35   20    It is what it is.  I'm not getting nothing out of
        21    this.  That's why I don't really -- I feel
        22    uncomfortable because I got to bring up -- when I go
        23    back to my cell, all these bad memories going to come
        24    back, and you guys going to go about your lives and
12:35   25    families and I'm not.  So I really don't have nothing
```

12:35   1   to lose or gain out of this situation but just my own

2   clarification on what happened back -- you know, back

3   then.  Period.

4       Q    Okay.  Just a couple more follow-ups.

12:35   5            If the officers were arresting a Hispanic

6   gang member that shot a black person, why would that

7   make the officers at the time racist as to blacks as

8   opposed to Mexicans?

9            MR. BARRETT:  Well, I'm going to object to

12:35   10  relevant.  I think that misstates his testimony.

11           But go ahead.

12           THE WITNESS:  I don't -- I don't -- you gotta

13  understand -- I don't understand that question at all.

14  You got to say it again.  I never -- I feel like all

12:36   15  police are -- are biased towards minorities, period.

16  So I don't understand your question.  Like, I feel

17  like they never -- police -- I feel like any police

18  are biased to minorities.  So I don't understand the

19  question.

12:36   20  BY MR. PLOWDEN:

21      Q    Well, earlier you said that -- that the cops,

22  they didn't like the blacks.

23           Were you talking about all cops, or were you

24  talking about the investigating detectives in this

12:36   25  case?

33

12:36    1          MR. BARRETT:  I'll object.  I think that

2    misstates his testimony.

3          THE WITNESS:  Right.  I never said the cops

4    were like the blacks.  I said the cops told me that

12:36    5    they gang specialized.  That they didn't like blacks.

6    I never said the cops didn't like blacks.  I said the

7    gang -- that he told me that that gang didn't like

8    blacks and that they were known for killing blacks.

9    You know, blacks, that's what they were known to do.

12:36    10    BY MR. PLOWDEN:

11      Q   Okay.  But if they were -- if they had that

12    attitude that they believed that the Mexican street

13    gang was killing blacks, you wouldn't consider that an

14    anti-black belief, would you?  Like racist against

12:37    15    blacks specifically?

16          MR. BARRETT:  I think it's -- Counsel, I

17    think you're misstating the testimony and it's

18    nonsensical.

19          But you can answer if you can.

12:37    20          THE WITNESS:  I don't understand that

21    question.

22    BY MR. PLOWDEN:

23      Q   Okay.  If they advised you that the street

24    gang had shot black kids -- I'm trying to figure out

12:37    25    whether you felt that that was racism as to blacks or

12:37  1    whether it was just racist generally.

2          A    It was racist -- if -- the KKK are known to

3    hang blacks, Jews or homosexuals, so I'm going to say

4    that gang, the KKK is biased against blacks, Jews and

12:38  5    homosexuals.  That gang at that time, he told me, are

6    biased against blacks.  So yes, I took that as, okay,

7    this is not just a street gang, but this is a street

8    gang that has -- this is a racist street gang towards

9    blacks.  So that definitely flagged my fire.

12:38  10         Q    But I mean, didn't you feel based on what

11   happened that night -- and I'm trying not to bring up

12   memories, but didn't you think that the people

13   involved in the shooting of you and your friends were,

14   in fact, Hispanic?

12:38  15              MR. BARRETT:  I'm going to object.

16   Irrelevant.  But you can answer.

17              THE WITNESS:  Respect, yeah.

18   BY MR. PLOWDEN:

19         Q    Right.  And based on what you and your

12:38  20   friends initially told the officers right after the

21   shooting, it was appropriate for the detectives to

22   focus on young men who were Hispanic, who were

23   probably part of a street gang in that area, correct?

24              MR. BARRETT:  Well, I'm going to object.

12:39  25   That calls for expert opinion from a lay witness about

12:39   1   police practices, and it's irrelevant.

        2   BY MR. PLOWDEN:

        3       Q    Go ahead.  You can answer.

        4           MR. BARRETT:  You can answer if you can.

12:39   5           THE WITNESS:  Yeah, only thing I can say on

        6   that is if -- me being my age now, if you're telling

        7   me that you have a gang that's specializing in killing

        8   a certain race and the victim -- and I'm a victim.

        9   That's going to make me feel more -- that's going to

12:39  10   make me feel more infuriated towards that gang because

       11   you're not just -- it wasn't just a street act of a

       12   gang that you're -- you're basically doing that to all

       13   blacks.  So that's how I felt at the time.

       14   BY MR. PLOWDEN:

12:39  15       Q    Didn't you want to understand what had

       16   happened to you?

       17       A    Yeah, but I think -- I understand what you're

       18   saying now.  Now I understand the question.  But this

       19   is what I feel.  If -- when you have a six-pack, if I

12:40  20   have a six-pack on a picture of people, why are you

       21   telling me at the time of me about to pick out this

       22   picture that not only that this gang has just murdered

       23   a nine-year-old and a 13-year-old boy within weeks and

       24   this is their motive, then you bring out the six-pack,

12:40  25   I feel like you're giving me motive.

12:40    1            Now you gave me more motive -- even if I was

         2    50-50, now you're giving me a motive now.  I think

         3    that was -- I don't think they should have did that to

         4    a 17-year-old that just got shot two weeks prior to

12:40    5    that.  I think that wasn't supposed to -- I don't

         6    think they should have did that because now that's

         7    flipping my mind to think, okay, this is what they do,

         8    this is what it is.  It is what it is.

         9    BY MR. PLOWDEN:

12:40   10        Q    You were interviewed twice, once on the 9th

        11    at your mom's apartment in Ontario, and they showed

        12    you some pictures at that time, correct?

        13        A    Right.

        14        Q    Okay.  And were you aware that in one of the

12:41   15    pictures that they showed you, the guy that was also

        16    present in the second six-pack, about 13 days later

        17    when you made the identification, that he was in that

        18    group of photos?

        19        A    No, I wasn't.

12:41   20        Q    Okay.  So you were unaware at the time you

        21    made the identification of Mr. Milla that you had seen

        22    his photograph before; is that true?

        23        A    Right.

        24        Q    Okay.  So let me ask you this.  Now that you

12:41   25    know that Mr. Milla was in that first group of

| | | |
|---|---|---|
| 12:41 | 1 | photographs, if the officer were trying to jam a |
| | 2 | particular guy, why didn't they point to his |
| | 3 | photograph during that first interview? |
| | 4 | MR. BARRETT:  I'm going to object.  That |
| 12:41 | 5 | calls for complete speculation, and it calls for |
| | 6 | expert witness testimony. |
| | 7 | If you know how -- if you can answer that. |
| | 8 | THE WITNESS:  No, I can't answer that |
| | 9 | question. |
| 12:41 | 10 | BY MR. PLOWDEN: |
| | 11 | Q    Okay.  So let me ask you this.  You said the |
| | 12 | officers, you know, were racist, that they wanted to |
| | 13 | pressure you into picking someone. |
| | 14 | Why go to the trouble of going to visit you a |
| 12:42 | 15 | second time when they had the suspect in that first |
| | 16 | group of photographs? |
| | 17 | MR. BARRETT:  Well, hold on.  He never said |
| | 18 | the officers were racist, and that completely calls |
| | 19 | for speculation.  How would he know why an officer is |
| 12:42 | 20 | going to go visit him? |
| | 21 | MR. PLOWDEN:  Counsel, he's expressed |
| | 22 | opinions about the officers during the six-pack ID. |
| | 23 | I'm trying to figure out in his mindset what the basis |
| | 24 | is for that given the fact that the officers have the |
| 12:42 | 25 | suspect's picture the first time they interviewed him. |

38

12:42   1            MR. BARRETT:  Well, there's completely

        2   different circumstances if you --

        3            MR. PLOWDEN:  Counsel, you don't have to make

        4   speaking objections.

12:42   5            MR. BARRETT:  You're giving me a sentence or

        6   two about why you're asking the question.  So I'm

        7   going to respond when you ask that.  But again, it

        8   calls for speculation as to what the officers were

        9   thinking.  Ask him what he thinks or what he believes.

12:43  10            MR. PLOWDEN:  That's what I'm asking him.

       11   BY MR. PLOWDEN:

       12       Q    Sorry, Mr. Jenkins.  So you got interviewed

       13   twice in Ontario.  The officers had photographs of

       14   possible Hispanic young men who might be the shooter

12:43  15   the first time they talked to you.

       16            Is that your understanding?

       17       A    Yes.

       18       Q    Okay.  And during that initial interview

       19   where they showed you a bunch of photographs of

12:43  20   possible suspects, they didn't point to a particular

       21   person at that time, correct?

       22       A    Say that again.

       23       Q    All right.  When they talked to you on the

       24   9th of October, which was your first interview in

12:43  25   Ontario at your mom's apartment, they showed you some

12:43  1   photographs; is that correct?

2        A    Right.

3        Q    And during that viewing of those

4   photographing -- during the viewing of those

12:44  5   photographs on that first visit in October of 2001,

6   the detectives did not pressure you to pick a

7   particular photograph, correct?

8        A    No.  Only time they tried to pressure you is

9   when the six-pack was there.

12:44  10       Q    Okay.  And did they say or do something

11   between the first meeting and the second meeting that

12   gave you some kind of understanding why they would

13   pressure you during the second meeting?

14            MR. BARRETT:  Objection.  Calls for

12:44  15   speculation.

16            If you know.

17            THE WITNESS:  I don't know.  I don't know.  I

18   don't know why.

19   BY MR. PLOWDEN:

12:44  20       Q    You can't think of anything, right?

21        A    No, I can't.

22        Q    Okay.  What is it -- if you can just tell me

23   briefly, what is it about the way you were treated

24   during your robbery and forgery arrest and prosecution

12:45  25   that you felt was wrong?

```
12:45    1                MR. BARRETT:  Objection.  Irrelevant.

         2                But if you can answer, you can answer.

         3                THE WITNESS:  I mean, it was even before

         4       then.  Just period.

12:45    5       BY MR. PLOWDEN:

         6          Q    Okay.

         7          A    Just period.

         8          Q    Can you give me a couple of examples?  Were

         9       there other arrests or --

12:45   10          A    Just seeing the history of how -- how -- how

        11       the system treats minorities.  I'm just saying being

        12       around -- being -- living in the street life, being in

        13       the streets, seeing how detectives and police, their

        14       motives and just personal opinions and personal

12:46   15       struggles I've been going through.  Since that day.

        16          Q    And would that include arrests and

        17       prosecutions in your life?

        18          A    Yeah.

        19          Q    Okay.

12:46   20          A    Not just in my life.  In friends and family.

        21          Q    Okay.  And would you agree that during the

        22       preliminary hearing and trial testimony that you gave,

        23       that your memory about the physical features of the

        24       shooter were fresher in your mind than they are now?

12:46   25          A    Yeah, for sure.
```

12:46   1     Q   And have you been influenced in any way since

2   you've been inside by any persons associated with

3   Mr. Milla's street gang, such as Mexican mafia or

4   204th Street?

12:47   5     A   No, not at all.

6         MR. BARRETT:  I'm going to object.  It

7   misstates the evidence.  But he answered it, so that's

8   fine.

9   BY MR. PLOWDEN:

12:47   10     Q   Okay.  You said that during the six-pack

11   identification at the second visit at your mom's

12   apartment in Ontario, a detective made some kind of

13   pointing motion towards photographs; is that right?

14      A   Right.

12:48   15     Q   Okay.  Where did that occur?

16         MR. BARRETT:  Objection.  Vague.

17   BY MR. PLOWDEN:

18      Q   Was it outside?  In the kitchen?  On a table

19   somewhere?

12:48   20     A   On a table.

21      Q   Where was the table?

22      A   I can't remember that, that apartment was

23   laid out.  It was a long time ago.  But it was on a

24   table, though.  I could say the kitchen.  It was just

12:48   25   a one-bedroom small apartment.

12:48   1      Q    Okay.  The detectives, before they started

2      the identification process, explained to you the rules

3      about picking someone out; is that right?

4      A    I can't recall, but yeah.  I can't really

12:48   5      recall.

6      Q    Okay.

7      A    I don't remember, right, word for word what

8      it was.

9      Q    Okay.  And were you aware at the time the

12:48  10      detectives were showing you the six-pack that they

11      were trying to eliminate the person you picked out?

12           MR. BARRETT:  Well, I'm going to object.

13      Calls for speculation.

14           If you know.

12:49  15           THE WITNESS:  Yeah, I don't remember.  I

16      don't know.

17      BY MR. PLOWDEN:

18      Q    Okay.  And when the six-pack was laid out to

19      you, was there anything about the six photographs that

12:49  20      caused you to focus on one particular person rather

21      than the other five?

22      A    Yeah.

23      Q    What did you see that caused you to focus?

24      A    He just kept putting his -- kept putting his,

12:49  25      like, thumb -- kept putting his finger like -- he just

43

12:49  1    kept putting his finger right there.

2         Q    Okay.  And was that the -- which person was

3    doing that?

4         A    I don't -- I think it was the older

12:49  5    detective.  I can't -- if I remember, it was the older

6    detective.

7         Q    Okay.  And was -- do you remember where in

8    the six-pack he was pointing of the pictures, which

9    one he was pointing to?

12:50  10        A    I can't -- I can't -- I don't -- I just

11   remember whatever picture it was, he kept just -- he

12   just kept putting his finger right there.

13        Q    Was it his finger or his thumb?

14        A    Thumb, finger.

12:50  15        Q    Okay.  Was the person that he was pointing --

16   the photograph that he was pointing to, was it on the

17   upper row or lower row of that six-pack?

18        A    I can't remember.

19        Q    All right.  And when you selected someone,

12:50  20   did you say you were positive at any time?

21        A    I can't remember.

22        Q    Okay.  Do you recall circling the six-pack

23   and putting your initials and the date next to it, a

24   particular photograph in that six-pack?

12:51  25        A    I don't remember.

12:51   1     Q   Okay.  Do you recall circling any particular

2   photograph?

3     A   I don't remember -- I don't remember

4   circling.  I don't really remember none of that.

12:51   5     Q   Do you even remember writing the statement

6   that I just showed you?

7     A   That's my handwriting for sure, but like I

8   said, it was so long ago.  Only thing I can remember

9   from that day was just the detectives coming over

12:51  10   there and just kept -- I remember they showed me like

11   a six-pack of just -- I just can't remember seeing his

12   thumb on like one of them pictures and I just took it

13   as, like -- you know, that's how I was taking it.

14         He was just like pointing, like, towards a

12:51  15   scar on one of them faces, like, "Did he have a scar?"

16   he kept asking me.  I'm like -- you know, I'm looking

17   at the pictures, like a scar, and I was like yeah.

18   Because I did tell them -- I did tell 'em -- I

19   remember I did tell him -- like I think I told him

12:52  20   like it was on the first -- when I told one of mutual

21   friends, I was like, I think it was -- I think he had

22   a scar, and I guess they ran with it.  I can't

23   remember.

24         All I remember from that day is they came

12:52  25   over and kept showing me some six-pack.  But I

12:52   1   remember he just kept pointing with his thumb.  And I

2   was -- and I remember it was the same picture from

3   like -- I guess he flipped them around and it was the

4   same one -- you know, I'm like all right.  He was just

12:52   5   like -- I was pointing him out.  That was it.  I don't

6   remember signing nothing or circling nothing.  I don't

7   remember all that.  I can't tell you.

8       Q    Okay.  And when you say flip around, what do

9   you mean by flipping around the pictures?

12:52   10      A    He was flipping pictures.  I'm just -- like,

11  with my estimate, I think, if I'm not mistaken, he

12  flipped a couple pictures over and that was it.

13      Q    So --

14      A    I'm just estimating.

12:53   15      Q    Right.  And your estimate of the -- of the

16  time that a detective was putting his thumb towards a

17  particular picture, you were flipping through various

18  pictures at the time?

19      A    Yeah.  I think so, yeah.

12:53   20      Q    So they weren't all on a card fixed?  There

21  were several pages of photographs?

22      A    Yes, something like what y'all got.

23          MR. BARRETT:  He's pointing at the exhibits,

24  so -- or pointing towards the exhibit which we showed

12:53   25  him earlier, the one with the -- the exhibit we showed

46

12:53   1   him.  Do you want to show it to him again -- well, he

        2   doesn't want to look at it.  Whatever.  I understand.

        3   BY MR. PLOWDEN:

        4       Q    When you were -- when you were contacted to

12:54   5   testify, did -- did you speak to the DA, the

        6   prosecutor?

        7       A    I don't remember.  I don't remember all that.

        8       Q    Do you remember ever getting interviewed by

        9   the prosecutor?

12:54  10       A    I don't.  I don't remember.

       11       Q    Okay.  You had some friends with you that

       12   also made some identifications in the case; is that

       13   right?

       14       A    I can't -- I can't -- I don't know what

12:54  15   they -- it was only two of us.  Only one of us that

       16   survived was me and another dude.  That was it.

       17       Q    Wasn't there a female also that survived?

       18       A    Yeah.  She never got shot, though.  I don't

       19   remember her, though.  I mean, I remember her, but I

12:54  20   don't know her name or nothing.

       21       Q    And did you or any of the other witnesses

       22   ever discuss officers pressuring you to pick a

       23   particular person?

       24       A    No, we never talked about that.

12:55  25       Q    So as far as you know, you're the only person

12:55  1  who felt pressure to pick a particular person?

2      A   Right.

3      Q   Okay.  And the first time you mentioned that

4  is just today; is that right?

12:55  5      A   Right.

6      Q   And when you were asked about it at prelim

7  and trial, you denied that the officers told you to

8  pick a particular person, right?

9      MR. BARRETT:  I'm going to object.  That may

12:55  10  misstate the evidence and it's overbroad unless you

11  show him the testimony.

12       If you recall.

13      THE WITNESS:  I don't recall.  I don't

14  really -- I don't remember.  I don't really remember.

12:55  15  BY MR. PLOWDEN:

16      Q   Do you remember that the attorney for

17  Mr. Milla at time of trial asked you about how the

18  six-pack went down, how the detective showed it to

19  you?  Do you remember that much?

12:55  20      A   I really don't remember the trial.

21      Q   Okay.  And the transcript of what you said

22  then at time of trial and prelim, that -- that's not

23  something you've reviewed today, correct?

24      A   No.  No.

12:56  25      Q   But when you were in court testifying at

12:56   1   prelim and the preliminary at trial, you were telling

2   the truth at the time, correct?

3          MR. BARRETT:  Well, I'm going to object.

4   It's leading.

12:56   5          But you can answer.

6          THE WITNESS:  I just -- at that time, I felt

7   like that's what I wanted do.  I wasn't -- I don't

8   know if it was the truth or not.  I was just doing

9   what I felt at that time being a victim, just being --

12:56   10  you know, just being frustrated in my life about the

11  whole ordeal, I just felt like that was -- I just felt

12  like that was just what I was doing.

13  BY MR. PLOWDEN:

14      Q   Were you trying to tell the truth at least?

12:56   15         MR. BARRETT:  I'll object.  Calls for

16  speculation.

17          If you recall.

18          THE WITNESS:  Yeah, I don't really -- I don't

19  really remember -- truthfully, I don't know what I was

12:57   20  doing at that time.  I don't really -- I can't

21  remember what I was thinking.

22          MR. PLOWDEN:  Okay.  I don't have any further

23  questions.  Thank you.

24          MR. BARRETT:  Let me just check my notes.

12:57   25

```
12:57   1                      FURTHER EXAMINATION

        2    BY MR. BARRETT:

        3        Q    Just one thing.  We never -- well, we did

        4    come and see you and asked you if you were willing to

12:57   5    do a deposition.

        6             Do you recall that --

        7        A    Right.  Right.

        8        Q    -- a couple weeks ago?

        9        A    Right.

12:57  10        Q    And you said yes?

       11        A    Right.

       12        Q    And that was -- was that the extent of our

       13    conversation?  We all left after that?

       14        A    Right.  Right.

12:57  15             MR. BARRETT:  Nothing further.

       16

       17                      FURTHER EXAMINATION

       18    BY MR. PLOWDEN:

       19        Q    So you did have contact with these attorneys

12:57  20    before today?

       21        A    Yeah.

       22        Q    Oh, okay.  And how long did that meeting take

       23    place?

       24        A    It was about 20 minutes, 25 minutes.

12:57  25        Q    Okay.  And what did they tell you?
```

12:57    1        A      They just asked would I do a deposition.

         2        Q      Okay.  And did they explain that they were

         3    representing Mr. Milla?

         4        A      Right.

12:58    5        Q      And did they tell you that Mr. Milla was let

         6    go or exonerated?

         7        A      I actually found out -- I knew he was -- I

         8    think 2012 or '13, some -- some detectives told me

         9    when I was on -- on parole, they came to see my parole

12:58   10    officer, and they told me that he was going to be

        11    getting let out.

        12        Q      Okay.  And do you know the circumstances of

        13    how he got let out?

        14        A      I don't.  I don't know the circumstances.

12:58   15        Q      And did the attorneys who were there with you

        16    when they visited you a couple weeks ago, did they

        17    tell you the circumstances of how Mr. Milla got let

        18    out?

        19        A      Huh-uh.

12:58   20        Q      Did they say anything like, "You won't have

        21    to come to court if you give a deposition today," or

        22    words to that effect?

        23        A      Never told me nothing.  That's why I asked.

        24    I don't -- they never told me nothing.

12:59   25        Q      Okay.

51

12:59    1        A    Just what I told them, like I'm going to tell

         2    y'all to get it on the record, it was just something I

         3    wanted to get off my chest.  I'm not trying to go

         4    through the whole court -- I'm not trying to do none

12:59    5    of that.  I'm just telling you what happened just to

         6    get it off my chest, and that was it.

         7            That's all I told them, like I'm telling you,

         8    like I'm telling -- whatever -- whatever this is, I

         9    just wanted to get it off my chest.  At that time, I

12:59   10    can't really remember everything, but I do remember

        11    that I was always 50-50 on the whole thing.  That was

        12    it.  I -- whether he did it or not, I don't -- but if

        13    he got convicted or, you, know he went home on -- I

        14    don't -- like, you know, I'm not -- I'm not here --

12:59   15    you know, I just felt like at that time, I wasn't -- I

        16    wasn't a hundred percent sure if he was or not.  You

        17    know, it is what it is.  I didn't feel right about

        18    that.  It always been on my chest.

        19            But that was the only reason why I'm here.

13:00   20    I'm not here for nothing else.  I'm not here to

        21    collect no -- I'm not here for nothing.  That was just

        22    it.  I just want to be done with it, wash my hands

        23    with it.  That was it.

        24        Q    Okay.  But how did -- how did the attorneys

13:00   25    know that you were trying to get something off your

13:00   1    chest?

        2        A    They didn't know nothing.  I could have --

        3    they came, I could have just walked out.  I'm out of

        4    here.  When I heard -- when I heard the whole

13:00   5    situation, it was just something that -- you know, I

        6    thought about it.  I wasn't -- I wasn't -- a part of

        7    me didn't want to come today because I was still,

        8    like, man, I don't want to be -- I don't want to even,

        9    like, bring -- talk -- I don't talk about this.  I

13:00  10    don't talk about it to nobody.  It's just something I

       11    buried in my past.

       12            I don't really like talking about it.  But

       13    it's just something, I thought about it.  I wasn't

       14    going to come today.  I (inaudible), but it was just

13:01  15    something I felt I had to get off my chest.  I'm not

       16    trying to be on nobody's side.  I'm just -- it's just

       17    something I had to get off my chest.  I don't know how

       18    it's going to go from here, but I just -- I just

       19    needed to get it off my chest to go forward with my

13:01  20    life, and that was it.

       21        Q    Right.  And the feeling of wanting to get

       22    something off your chest, that started in 2012 when

       23    you learned about Mr. Milla getting out?

       24        A    Not really, no.  I didn't have no really --

13:01  25    when they told me it was a possibility, I just --

53

13:01    1    detectives came and seen me, asked me did they -- I

         2    just told -- I shut it down at the time.  I didn't

         3    even want noting to do with it.  And then it kind of

         4    just -- it kind of just was on my mind.  Like, not

13:01    5    every day, but I just buried it.

         6            And when they came to see me, now that I've

         7    been incarcerated, I just kind of felt like, you know

         8    what man, I don't know if it was right or wrong, but I

         9    just felt like -- it's probably what -- my testimony.

13:02   10    I don't know if he would -- if it would have -- if he

        11    would have got convicted.  You know what I'm saying?

        12    I wouldn't know if that conviction would have happened

        13    or not.

        14            But I just -- it is what it is man.  It's

13:02   15    something that I just -- I just felt like I got to do.

        16    You know what I'm saying?  Nobody is pressuring me on

        17    this time.  This is just me.

        18        Q    Okay.  When you testified in the preliminary

        19    hearing at trial back in 2001, 2002, were you facing

13:02   20    any criminal charges yourself at the time?

        21        A    Well, I do remember when they came and seen

        22    me from -- one of them, they -- I was working.  And I

        23    had a boss at the time come to me and tell me, like,

        24    "Y'all if you don't go to these -- these detectives

13:02   25    are calling my phone, and, like, if you don't go to,

13:02   1   like, show up at court, they're going to come and

        2   arrest me."

        3          And I'm, like, at the time, I never been in

        4   jail, so I'm like, what the fuck, like why -- so he's

13:02   5   like, "Man, you just better go handle it, whatever you

        6   got to handle."  And I'm, like, "Man, this is crazy."

        7          So that was then.  That was the only time I

        8   went.  That was -- that's why I went.  Besides that, I

        9   never would have went back then, but, like I said,

13:03  10   they said I was going to come to jail for contempt of

       11   court and all that.  I was young.  I didn't want to go

       12   to jail.  I didn't know how they worked it at that

       13   time.  I don't know.

       14       Q    Okay.  In terms of picking a particular

13:03  15   person out in court, you didn't have like a charge

       16   pending against you or the detectives were threatening

       17   you with that charge at the time you made the ID in

       18   court, correct?

       19       A    No.

13:03  20       Q    And at the time you made the ID from the

       21   six-pack, the detectives weren't bringing up any

       22   pending charges against you or anything like that,

       23   correct?

       24       A    No.

13:03  25       Q    Am I correct?

13:03    1        A    Yes.

         2        Q    Okay.

         3             MR. PLOWDEN:  Okay.  No further questions.

         4        Thank you.

13:04    5

         6                      FURTHER EXAMINATION

         7        BY MR. BARRETT:

         8        Q    Just so we're clear, you didn't have any

         9        pending charges against you, did you?

13:04   10        A    No.

        11        Q    You were a nice kid that was never arrested,

        12        right?

        13        A    No.

        14        Q    True?

13:04   15        A    True.

        16             MR. BARRETT:  Thank you.  Nothing further.

        17             THE VIDEOGRAPHER:  Counsel, you want to go

        18        off the record now?

        19             MR. BARRETT:  Are we done, Mr. Plowden, just

13:04   20        so we're sure?

        21             MR. PLOWDEN:  Right.  We have one exhibit,

        22        and I'll take a copy.

        23             MR. BARRETT:  Okay.  Great.

        24             MR. PLOWDEN:  And the original should

13:04   25        probably go to the deponent unless you're going to

13:04   1   visit him again and then go over the transcript with

        2   him.

        3           MR. BARRETT:  No, we're not going to do that

        4   probably.  But we will -- what we're going to do is

13:04   5   we'll -- well, I'm not sure about the Code in federal

        6   court.

        7           MR. PLOWDEN:  Well, you can't -- you can send

        8   the transcript if there's a custody officer there,

        9   there may be an ability to mail the transcript to

13:04  10   Mr. Jenkins --

       11           MR. BARRETT:  Right.

       12           MR. PLOWDEN:  -- for his review and

       13   signature.

       14           MR. BARRETT:  Right.  And if he fails to sign

13:05  15   within 30 days, can we stipulate that there will be no

       16   corrections?  From 30 days from the time of receipt.

       17   And that the certified copy may be used in its place.

       18   Does that sound fair?

       19           MR. PLOWDEN:  That seems reasonable.

13:05  20           MR. BARRETT:  Okay.  I'm just trying to get a

       21   fair stipulation so that we can all agree.

       22           And so we're going to send it to you.  And

       23   you'll have 30 days to read, sign and make any changes

       24   to it, and we'll send an extra envelope, hopefully, so

13:05  25   that way you can send it back to my office.

13:05  1          THE CERTIFIED REPORTER:  Excuse me.  I'll

       2   just say that as the court reporter, I'm not

       3   stipulating to anything.  I'm going pursuant to

       4   whatever the Code says.

13:05  5          MR. BARRETT:  Okay.  Then I guess that's how

       6   it is, Jeff.

       7          MR. PLOWDEN:  That's fine.  I've never done a

       8   Code with an inmate, so that's fine.

       9          MR. BARRETT:  Yeah, I never have either, but

13:05  10  we'll see.  We'll go by Code, and, you know, if you --

       11  if you -- and we'll let you know if there's any -- you

       12  know, a method for making changes.

       13         I think they mail you a letter or something

       14  like that.  We'll figure it out.  If we have to, we'll

13:06  15  send him a copy of the transcript ourselves and he can

       16  have a chance to read, sign and correct it with

       17  30 days to send it back if there's any corrections.

       18         Does that sound good, Jeff?

       19         MR. PLOWDEN:  Yeah, that's fine.  Let me just

13:06  20  indicate that the use of the transcript in later

       21  proceedings is subject to defendant's objections due

       22  to the irregularity in the notice and the proceedings.

       23  We've discussed some of that.

       24         But we are -- we are going to object to the

13:06  25  use of the deposition in lieu of live testimony at

13:06   1   this time, and you and I can talk about that with the

2   judge later.

3   MR. BARRETT:  Yeah, well, we -- you agreed to

4   the date.  You're here.  You were clear to come if you

13:06   5   wanted to, according to ???Gayton, and you told me you

6   were clear to come if you wanted to yesterday.  You

7   chose not to and you chose to do it by Zoom.

8   But everyone reserves all their rights,

9   including attempting to play it, not play it, object

13:06   10  to it, not object to it, object to questions, not

11  object to questions.

12  MR. PLOWDEN:  That's fine.  As long as the

13  objection is preserved, that's fine.

14  Okay.  Thank you.

13:07   15  THE VIDEOGRAPHER:  This is the end of Media

16  No. 1 in the deposition of Ramar Jennings.  The time

17  is 1:07 p.m.  We are now off the record.

18

19

20

21

22

23

24

25

# PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 100 Wilshire Blvd, Suite 700, Santa Monica, California 90401.

On **April 11, 2022,** I served the foregoing document(s) **DECLARATION OF MARTIN STANLEY IN SUPPORT OF PLAINTIFF MARCO MILLA'S APPLICATION FOR WRIT OF HABEAS CORPUS AD TESTIFICANDUM AND/OR FOR AN ORDER THAT THE VIDEO TAPED DEPOSITION MAY BE USED IN PLACE OF PERSONAL APPEARANCE** on the interested parties in this action by email as follows:

**Attorney for Defendants:**
Geoff Plowden
Email: geoffrey.plowden@lacity.org

BY ELECTRONIC DELIVERY DUE TO COVID-19

[**X**] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on **April 11, 2022,** at Santa Monica, California

By:  _/s/_ MARTIN STANLEY
Martin Stanley